**PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 12-1022
_____

GENON REMA, LLC,

Petitioner

v.

UNITED STATES ENVIRONMENTAL PROTECTION
AGENCY,

Respondent
_____

On Petition for Review of Final Agency Action
of the United States Environmental Protection Agency
(EPA-HQ-OAR-2011-0081)
_____

Argued March 18, 2013

Before: FUENTES, CHAGARES, and BARRY,
*Circuit Judges*

(Opinion Filed: July 12, 2013)

William M. Bumpers, Esq. **[ARGUED]**
Brook Detterman, Esq.
Debra J. Jezouit, Esq.
BAKER BOTTS L.L.P.
1299 Pennsylvania Ave., NW
Washington, D.C. 20004

Walter Stone, Esq.
GenOn Energy Inc.
601 13th Street, N.W.
Suite 850N
Washington, D.C. 20005

     *Counsel for Petitioner, GenOn REMA, LLC*

George P. Sibley, III, Esq. **[ARGUED]**
HUNTON & WILLIAMS LLP
951 E. Byrd Street
Richmond, VA 23219

Andrea B. Field, Esq.
Elizabeth L. Horner, Esq.
HUNTON & WILLIAMS LLP
2200 Pennsylvania Avenue, N.W.
Washington, D.C. 20037

     *Counsel for Petitioner-Intervenor, Utility Air Regulatory Group*

Thomas A. Lorenzen, Esq.
U.S. Department of Justice
Environmental Enforcement Section

P.O. Box 7611
Washington, D.C. 20044

T. Monique Peoples, Esq. **[ARGUED]**
U.S. Department of Justice
Environmental Defense Section
Suite 8000
601 D. Street, N.W.
Washington, D.C. 20004

Stephanie L. Hogan, Esq.
Office of General Counsel (2344A)
United States Environmental Protection Agency
1200 Pennsylvania Ave., N.W.
Washington, D.C. 20460

 *Counsel for Respondent, United States Environmental Protection Agency*

Jon C. Martin, Esq.
Ruth E. Musetto, Esq. **[ARGUED]**
Lisa J. Morelli, Esq.
Office of Attorney General of New Jersey
Division of Law
Richard J. Hughes Justice Complex
P.O. Box 093
25 Market Street
Trenton, NJ 08625

 *Counsel for Respondent-Intervenor, State of New Jersey*

Joseph O. Minott, Esq.
Clean Air Council
135 South 19th Street, Suite 300
Philadelphia, PA 19103

Zachary M. Fabish, Esq. **[ARGUED]**
The Sierra Club
50 F Street NW, 8th Floor
Washington, D.C. 20001

*Counsel for Respondent-Intervenors, Greenpeace,
Clean Air Council and The Sierra Club*

_____

OPINION OF THE COURT
_____

FUENTES, *Circuit Judge*:

Portland Generating Station ("Portland") is a 427-megawatt, coal-fired, electricity generating plant located in Upper Mount Bethel Township in Northampton County, Pennsylvania. Portland is directly across the Delaware River within 500 feet of Knowlton Township in Warren County, New Jersey. The EPA has found that Portland emits sulfur dioxide in amounts that significantly interfere with the control of air pollution across state borders. Sulfur dioxide is a toxic air pollutant that endangers life and health, causing burning of the nose and throat, difficulty breathing, and obstruction of

the lungs and airways.[1]  Because of its location, Portland's sulfur dioxide emissions travel directly across the river into areas of New Jersey.  In response to a petition under the Clean Air Act, the EPA issued a rule imposing direct limits on Portland's emissions and a schedule of restrictions to reduce its contribution to air pollution within three years.  GenOn REMA, LLC ("GenOn"), the owner and operator of Portland, challenges the EPA's rule as inconsistent with the agency's authority under the Clean Air Act and as arbitrary and capricious.  We will uphold the rule and deny GenOn's petition for review.

## I.    BACKGROUND

### A.    Statutory Background

The Clean Air Act authorizes the Environmental Protection Agency (the "EPA") to establish air quality standards and empowers the states to achieve those standards. Concerned Citizens of Bridesburg v. EPA, 836 F.2d 777, 779 (3d Cir. 1987) (internal citations omitted).  This "cooperative federalism" structure is a defining feature of the statute. Appalachian Power Co. v. EPA, 249 F.3d 1032, 1046 (D.C. Cir. 2001).  The Clean Air Act gives the EPA authority to establish national ambient air quality standards ("NAAQS") for certain pervasive air pollutants to protect public health and welfare.  42 U.S.C. §§ 7408, 7409.  Under Section 110 of the

---

[1] See *Sulfur Dioxide FAQS*, AGENCY FOR TOXIC SUBSTANCES AND DISEASE REGISTRY, (1999), http://www.atsdr.cdc.gov/tfacts116.pdf.

Clean Air Act, states are required to implement NAAQS through state implementation plans ("SIPs") that specify how NAAQS will be achieved and maintained in the state. Id. §§ 7407, 7410. States must adopt and submit SIPs to the EPA that provide for the "implementation, maintenance, and enforcement" of NAAQS within their borders no later than three years after the EPA promulgates a particular NAAQS.[2] Id. § 7410(a)(1).

If the EPA approves the SIPs, they become enforceable as federal law. Id. § 7413. If the EPA finds that a SIP is inadequate to attain or maintain a NAAQS or otherwise does not comply with the Clean Air Act, the EPA issues a "SIP call" requiring the state to submit a revised SIP to correct the inadequacies. Id. § 7410(k)(5). The EPA may also promulgate a Federal Implementation Plan ("FIP") to establish direct federal controls on sources of air pollution if the EPA disapproves a SIP in whole or in part, or finds that a

---

[2] After the promulgation of a new or revised NAAQS, the EPA designates a list of areas in each state that are in "nonattainment," "attainment," or "unclassifiable" with the NAAQS. 42 U.S.C. § 7407(d)(1)(B). An area designated as in "nonattainment" is one "that does not meet (or contributes to ambient air quality in a nearby area that does not meet)" the NAAQS for the pollutant. Id. § 7407(d)(1)(A)(i). An area in "attainment" meets the NAAQS for the pollutant. Id. § 7407(d)(1)(A)(ii). An area designated as "unclassifiable" is one that "cannot be classified on the basis of available information as meeting or not meeting" the NAAQS for the pollutant. Id. § 7407(d)(1)(A)(iii).

state has failed to submit either a SIP or SIP revision. Id. § 7410(c).

Section 126(b) of the Clean Air Act allows downwind states to petition the EPA for a finding that a source in an upwind state affects the petitioning state's attainment or maintenance of NAAQS due to air pollution emanating from the source in the upwind state. See id. § 7426(b). Section 126(b) of the Clean Air Act provides:

> Any State or political subdivision may petition the [EPA] for a finding that any major source or group of stationary sources emits or would emit any air pollutant in violation of the prohibition of section 7410(a)(2)(D)(ii)[3] of this title or this section. Within 60 days after receipt of any petition under this subsection and after public hearing, the [EPA] shall make such a finding or deny the petition.

Id.

---

[3] The cross-reference to "section 7410(a)(2)(D)(ii)" in Section 126(b) has been determined to be a scrivener's error and the correct cross-reference in this provision is to Section 7410(a)(2)(D)(i) of the Clean Air Act. See Appalachian Power Co. v. EPA, 249 F.3d 1032, 1040-44 (D.C. Cir. 2001). We agree with this determination, and the parties do not dispute it. Accordingly, we will refer to Section 126(b) of the Clean Air Act as referencing Section 7410(a)(2)(D)(i) of the Clean Air Act.

In turn, Section 7410(a)(2)(D)(i), also known as the "good neighbor provision," prohibits sources or emissions activity within a state from emitting air pollutants in amounts that will:

> (I) contribute significantly to nonattainment in, or interfere with maintenance by, any other State with respect to any such national primary or secondary ambient air quality standard, or

> (II) interfere with measures required to be included in the applicable implementation plan for any other State . . . to prevent significant deterioration of air quality or to protect visibility.

Id. § 7410(a)(2)(D)(i).

If the EPA finds, pursuant to a Section 126(b) petition, that the upwind state is violating the good neighbor provision of the Clean Air Act, the polluting source must cease operations within three months of the EPA's finding. Id. § 7426(c). The EPA may, however, allow the source to continue operations beyond three months if the source "complies with such emission limitations and compliance schedules (containing increments of progress)" as the EPA deems necessary to reach the compliance requirements. Id.

## B. NAAQS Regulating Sulfur Dioxide Emissions

Sulfur dioxide, or $SO_2$, is a "highly reactive colorless gas" that derives mainly from fossil fuel combustion. Am.

Lung Ass'n v. EPA, 134 F.3d 388, 389 (D.C. Cir. 1998). It smells like rotten eggs and causes acid rain at elevated concentrations in the air. Id. The presence of sulfur dioxide in the air creates adverse health effects, especially for people with asthma. Id. On June 22, 2010, the EPA revised the NAAQS that had previously regulated sulfur dioxide emissions to enact stricter standards and ensure the continued protection of public health with an "adequate margin of safety." Primary National Ambient Air Quality Standard for Sulfur Dioxide, 75 Fed. Reg. 35,520, 35,521 (June 22, 2010) (to be codified at 40 C.F.R. pts. 50, 53, 58) ("1-hour $SO_2$ NAAQS"). Specifically, the EPA replaced the 24-hour and the annual standards that had been in place with a new short-term, more stringent standard that sets the level of sulfur dioxide emissions at 75 ppb (parts per billion) per the hour. Id. 1-hour $SO_2$ NAAQS became effective on August 23, 2010. As part of the implementation process of the 1-hour $SO_2$ NAAQS, states are required to submit their SIPs by June 2013 and to achieve attainment, implementation, maintenance, and enforcement of the NAAQS by August 2017. Id. at 35,577.

## C. The New Jersey Department of Environmental Protection's Section 126(b) Petition

On September 17, 2010, the State of New Jersey Department of Environmental Protection (the "NJ Department") filed a petition under Section 126(b) of the Clean Air Act, 42 U.S.C. § 7426(b), (the "Section 126(b) petition"), requesting that the EPA issue an order restricting sulfur dioxide emissions from Portland. Specifically, the NJ Department requested that the EPA make a finding that the

trans-boundary sulfur dioxide emissions from the nearby Portland plant significantly contribute to nonattainment and/or interfere with maintenance of the 1-hour $SO_2$ NAAQS in New Jersey. In support of its petition, the NJ Department submitted air quality and aerial dispersion modeling analyses[4] to show that emissions from Portland cause violations of the 1-hour $SO_2$ NAAQS in Warren, Sussex, Morris, and Hunterdon Counties in New Jersey.

On April 7, 2011, the EPA published a proposed response to the NJ Department's Section 126(b) petition, finding that sulfur dioxide emissions from Portland violate the interstate air pollution transport provisions of the Clean Air Act and suggesting emissions limitations and compliance schedules to remedy the problem. See Response to Petition from New Jersey Regarding $SO_2$ Emissions from the Portland Generating Station, 76 Fed. Reg. 19,662 (Apr. 7, 2011) (to be codified at 40 C.F.R. pt. 52) ("Proposed Rule"). The EPA invited public comments on the Proposed Rule and

---

[4] Dispersion modeling simulates air pollutant emissions as they are carried throughout the atmosphere. These models replicate the conditions of the atmosphere, providing "an estimate of the concentration of pollutants as they travel away from an emission source" and can be used "to determine whether a new source will adversely impact an area or to predict whether the control of an individual source will have a beneficial effect." *Dispersion Modeling* , AIR QUALITY MANAGEMENT ONLINE PORTAL, EPA, http://www.epa.gov/oaqps001/aqmportal/management/modeling/dispersion.htm (last visited June 19, 2013).

announced a public hearing to be held on April 27, 2011 in Warren County, New Jersey. The EPA received numerous public comments from inter alia, individuals, government officials, environmental groups, the Pennsylvania Department of Environmental Protection, the NJ Department, GenOn, and the American Lung Association of the Mid-Atlantic. Many of these comments favored the Proposed Rule. The Pennsylvania Department of Environmental Protection submitted a comment in which it acknowledged that residents of Pennsylvania would realize public health and environmental benefits from a reduction in sulfur dioxide emissions but suggested some alterations to the proposed compliance schedule.

On November 7, 2011, the EPA issued its final rule granting the NJ Department's Section 126(b) petition, which finds that Portland's sulfur dioxide emissions significantly contribute to nonattainment and interfere with maintenance of the 1-hour $SO_2$ NAAQS in New Jersey. See Final Response to Petition from New Jersey Regarding $SO_2$ Emissions from the Portland Generating Station, 76 Fed. Reg. 69,052, 69,053 (Nov. 7, 2011) (to be codified at 40 C.F.R. pt. 52) ("Portland Rule"). The EPA authorized the continued operation of Portland but imposed emissions limits and compliance schedules to bring Portland into compliance as expeditiously as practicable.

The EPA based its finding on a review of the NJ Department's air quality modeling, its independent assessment of the American Meteorological Society/Environmental Protection Agency Regulatory Model (AERMOD) dispersion modeling, and other highly technical analyses. Portland Rule, 76 Fed. Reg. at 69,053. The

11

Portland Rule requires Portland to reduce its sulfur dioxide emissions by approximately 81% at its two coal-fired generating units within three years of the rule's effective date and to adhere to interim sulfur dioxide emissions limits to ensure that Portland demonstrates the requisite increments of progress towards achieving final compliance. Portland Rule, 76 Fed. Reg. at 69,053, 69,064.

GenOn petitioned for our review of the Portland Rule, challenging the EPA's authority to impose direct regulations on Portland before the time that Pennsylvania is required to complete its Section 110 SIP process for the 1-hour $SO_2$ NAAQS. GenOn contends that this action offends the cooperative federalism structure of the Clean Air Act by undermining a state's power to determine how to achieve air control standards.

## II.    ANALYSIS

This Court has jurisdiction pursuant to Section 307(b)(1) of the Clean Air Act, which allows us to review a final EPA action that is locally or regionally applicable within our Circuit. 42 U.S.C. § 7607(b)(1); see Harrison v. PPG Indus., Inc., 446 U.S. 578, 584-94 (1980); W. Penn Power Co. v. EPA, 860 F.2d 581, 584 (3d Cir. 1988). Because the Portland Rule affects a facility located in the Commonwealth of Pennsylvania and its repercussions affect counties in the State of New Jersey, we have jurisdiction to review this matter. Although Section L of the Portland Rule, entitled "Judicial Review," indicates that petitions for review must be filed in the D.C. Circuit, the parties agree that this was noted in error. Jurisdiction in the D.C. Circuit is appropriate only for specifically enumerated EPA actions and for regulations

with national scope or impact.  Id.  The Portland Rule neither fits into the enumerated EPA actions nor is of nationwide scope or effect that would make jurisdiction in the D.C. Circuit proper.

We are asked to consider whether the prohibition against transmitting interstate air pollutants that is referenced in Section 126(b) relates to emissions limitations that are specifically contained in the Section 110 SIP of the upwind state or, more generally, to all interstate air pollution.  GenOn and the Utility Air Regulatory Group ("UARG"),[5] contending the former, view the Section 126(b) petition process as expressly linked to the SIP requirement of Section 110(a)(2)(D)(i), arguing that there can be no valid Section 126(b) petition until Pennsylvania is afforded an opportunity to establish its SIP for the 1-hour $SO_2$ NAAQS and has failed to do so.  The EPA, however, agrees with the latter approach, claiming that it can make a finding on a Section 126(b) petition without regard to the Section 110 SIP process.

We follow the Chevron two-step framework when reviewing an administrative agency's construction of a statute.  Hagans v. Comm'r of Soc. Sec., 694 F.3d 287, 294 (3d Cir. 2012).  If the statute is clear, we give effect to the unambiguous expressed intent of Congress.  De Leon–Ochoa v. Att'y Gen. of U.S., 622 F.3d 341, 348 (3d Cir. 2010) (citing Chevron, U.S.A., Inc. v. Natural Res. Def. Council, Inc., 467 U.S. 837, 842-43 (1984)).  However, if the statute is

[5] UARG has submitted an amicus brief in support of GenOn as petitioner-intervenor.

13

silent or ambiguous regarding a specific issue, we move to step two and give deference to the implementing agency's reasonable construction of the statute. Id.

## A. Chevron Step One

We begin by determining whether Congress has "unambiguously expressed [its] intent" by examining the "plain" and "literal" language of the statute. United States v. Geiser, 527 F.3d 288, 294 (3d Cir. 2008) (internal citations omitted). "To determine whether the statutory language is ambiguous, we must examine 'the language itself, the specific context in which that language is used, and the broader context of the statute as a whole.'" Rosenberg v. XM Ventures, 274 F.3d 137, 141 (3d Cir. 2001) (internal citations omitted). We "must not be guided by a single sentence or member of a sentence, but look to the provisions of the whole law, and to its object and policy." Prestol Espinal v. Att'y Gen. of U.S., 653 F.3d 213, 217 (3d Cir. 2011) (internal citations and quotations omitted).

The operative language of Clean Air Act Section 126(b) is that a petition under this section may be granted when a major source or group of stationary sources emits air pollutants "in violation of the prohibition of section 7410(a)(2)(D)[(i)]." 42 U.S.C. § 7426(b). The language of Section 7410(a)(2)(D)(i) states that each SIP for primary or secondary NAAQS "shall contain adequate provisions prohibiting . . . emissions activity within the [s]tate from . . . contribut[ing] significantly to nonattainment in, or interfer[ing] with maintenance by, any other [s]tate" with respect to such NAAQs or "interfer[ing] with measures required to be included in the applicable [SIP] for any other

14

[s]tate . . . to prevent significant deterioration of air quality or to protect visibility." Id. § 7410(a)(2)(D)(i).

While GenOn contends that the "prohibition" refers to a violation of an emissions limitation specific to the Section 110 SIP of the upwind state, its argument fails to take into account the entirety of the statutory scheme. When we consider the applicable language of the Clean Air Act in light of the overall statute and its interplay with other related sections, we conclude that the relevant language of the statute is unambiguous.

Section 126(b) contains no temporal limitation on a state's right to petition the EPA. This section obligates the EPA to grant or deny a Section 126(b) petition "[w]ithin 60 days after receipt . . . and after public hearing." Id. § 7426(b). This language demonstrates that the EPA must act quickly on a Section 126(b) petition—and not wait the potential several years that it would take for states to fully adopt SIPs implementing new NAAQS. As the EPA has correctly expressed, "nothing in the statutory language in section 126 prohibits a downwind state from filing a section 126 petition until after an upwind state, in which the source or sources are located, has submitted, or is required to submit, a section 110(a)(2)(D) SIP to the EPA for approval." Portland Rule, 76 Fed. Reg. at 69,055. We also agree with the EPA that there is no indication anywhere in the text of Section 126 that a Section 126(b) petition is conditional upon the initiation or completion of the SIP process. If such a condition were present, Section 126(b) petitions could stand still for several years until the SIP relating to a new NAAQS is adopted by a state, approved by the EPA, and all necessary revisions to it have been made. Such a result violates the statute's

15

requirement that the EPA act on Section 126(b) petitions within sixty days.

The language of Section 126(c) also supports our view. This section provides that it "shall be a violation of this section and the applicable implementation plan in such State . . . for any major existing source to operate more than three months after such [Section 126(b)] finding has been made with respect to it." 42 U.S.C. 7426(c) (emphasis added). We agree with the EPA that the underlined language would serve no purpose if we were to adopt GenOn's view since there would have been no need for Congress to separately state under Section 126(c) that a Section 126(b) finding constitutes a SIP violation if operation of the polluting source continues. "It is a cardinal principle of statutory construction that a statute ought, upon the whole, to be so construed that, if it can be prevented, no clause, sentence, or word shall be superfluous, void, or insignificant." TRW Inc. v. Andrews, 534 U.S. 19, 31 (2001) (internal citations and quotations omitted).

Our conclusion that the language of the statute is unambiguous is also supported by the D.C. Circuit's examination of three specific provisions of Section 126(b) in Appalachian Power Co. v. EPA, 249 F.3d 1032 (D.C. Cir. 2001). In Appalachian, several states submitted Section 126(b) petitions requesting that the EPA regulate sources emitting nitrogen oxide that contributed significantly to downwind air pollution in those states. Id. at 1036-37. The EPA ultimately issued a rule under Section 126(b) requiring upwind sources to conform to certain emissions limits and engage in an emissions trading program. Id. at 1039. At the time that the EPA issued this rule, the upwind states were also

16

subject to an ongoing Section 110 nitrogen oxide SIP call previously issued by the EPA, requiring deadlines by which these states had to revise their SIPs to comply with nitrogen oxide emissions reductions. Id. at 1037-38. Certain petitioners contested the EPA's Section 126(b) rule and, specifically, the EPA's interpretation of the interplay between Sections 110 and 126(b) of the Clean Air Act. Id. at 1045-46. The petitioners contended that Sections 110 and 126(b) prevented the EPA from making any Section 126(b) findings while the nitrogen oxide SIP call was ongoing because allowing the EPA to act in these circumstances would amount to a violation of the "cooperative federalism" structure of the Clean Air Act that gives states primary responsibility to address interstate transport in the first instance. Id. The D.C. Circuit rejected this argument. Recognizing that states indeed retain the power under Section 110 to determine how to achieve NAAQS and that the EPA may not "dictate" to a state a specific means to do so, the D.C. Circuit held that "this principle . . . cannot be absolute in the face of § 126, which contemplates that in at least some circumstances the EPA will directly regulate sources within a state." Id. at 1046.

The court in Appalachian reasoned that "three critical provisions of § 126 would lose their force if, as the petitioners suggest, the lengthened timetable of the nitrogen oxide SIP call were to suspend the § 126 process." Id. at 1047. First, Section 126's requirement that a source contributing to downwind nonattainment may not operate for more than three years after such finding would be eliminated if the EPA had to wait for completion of the SIP process to make Section 126 findings. Id. The second reason is that Section 126 provides for relief independent of any action by the upwind state, while a SIP revision requires action from that state. Id. Third,

17

relief under Section 126, unlike SIP calls, is independent of the discretionary policy preferences of the EPA since it must act on a petition within sixty days. Id. These provisions support our view that the statute unambiguously allows the EPA to make a Section 126 finding independently of the Section 110 SIP process.

In response to the petitioners' argument that the EPA's construction would effectively deprive Section 110 of its force by binding states to emissions limits set by the EPA and not by their own SIP, the court in Appalachian responded that it has never been suggested that under Section 110, states may "develop their plans free of extrinsic legal constraints." Id. "SIP development, like any environmental planning process, commonly involves decisionmaking subject to various legal constraints. That § 126 imposes one such limitation—and it is surely not the only independent provision of federal law to do so—does not affect a state's discretion under § 110." Id.

This line of reasoning supports our conclusion that the language of the Clean Air Act regarding the interplay of Section 126(b) and Section 110 is unambiguous. The plain language of the relevant portions of the statute and the context in which such language is used convey that Congress intended Section 126(b) as a means for the EPA to take immediate action when downwind states are affected by air pollution from upwind sources. Any other interpretation would defeat the underlying objective of the Section 126(b) petition process. For these reasons, we conclude that the plain language of the statute is unambiguous and supports the EPA's issuance of the Portland Rule.

Given the novelty of the issue before us, we find it appropriate to engage in an "in the alternative" analysis where we conduct step two of <u>Chevron</u> to determine whether the EPA has reasonably construed the statute. <u>See</u> <u>Pennsylvania Dep't of Pub. Welfare v. U.S. Dep't. of Health & Human Servs.</u>, 647 F.3d 506, 512 (3d Cir. 2011) (conducting the second step of the <u>Chevron</u> analysis even after finding the statute unambiguous). Even if the relevant language of the Clean Air Act were deemed ambiguous, we still find that the EPA's action was proper.

### B.     Chevron Step Two

Under step two of the <u>Chevron</u> framework, we consider whether the EPA's interpretation is reasonable in light of the language, policies, and legislative history of the Clean Air Act. <u>United States v. Riverside Bayview Homes, Inc.</u>, 474 U.S. 121, 131 (1985). While GenOn and UARG argue that the Clean Air Act's legislative history emphasizes the concept of cooperative federalism, including states' primary responsibility in implementing regulations promulgated by the EPA, this view is not dispositive to our determination of reasonableness. We neither disagree that the Clean Air Act is structured on cooperative federalism nor seek to minimize the essential role that the states play in this process. Rather, we believe that reliance on the Clean Air Act's legislative history that promotes the concept of cooperative federalism does not assist us in examining the rationale behind the enactment of Section 126(b) itself.

Congress enacted Section 126(b) as part of the Clean Air Act Amendments of 1977. Pub. L. No. 95-95, 91 Stat. 685, § 123 (1977). In a report accompanying its version of

19

the bill, the House of Representatives recognized that the law prior to 1977 had inadequately addressed the problem of interstate air pollution and that an effective program must rely on the state that actually receives the pollution and has an "incentive and need to act." H.R. REP. NO. 95-294, at 330 (1977), reprinted in 4 1977 LEGISLATIVE HISTORY OF THE CLEAN AIR ACT AMENDMENTS OF 1977, at 2797. The House of Representatives report states that Section 126(b) would remedy this problem so that any state could petition the EPA for a finding that "any new, modified, or existing stationary source in any other [s]tate is (or would be) emitting pollutants which cause or contribute to impermissible interstate air pollution." Id. In doing so, the House of Representatives acknowledged that the Section 126 mechanism would be a separate and alternative method for states to address interstate air pollution. Id. at 331.

> [A Section 126] petition process is intended to expedite, not delay, resolution of interstate pollution conflicts. . . . [T]he committee intends to create a second and entirely alternative method and basis for preventing and abating interstate pollution. The existing provision prohibiting any stationary source from causing or contributing to air pollution which interferes with timely attainment or maintenance or a national ambient air standard (or a prevention of significant deteriorating or visibility protection plan) in another State is retained. A new provision prohibiting any source from emitting any pollutant after the Administrator has made the requisite finding and granted the petition is an

20

independent basis for controlling interstate air pollution.

Id. (emphasis added).

Additionally, the House of Representatives report indicated that an effective program addressing the problem of interstate air pollution "must include a Federal mechanism for resolving disputes which cannot be decided through cooperation and consultation between the States or persons involved." Id. at 330.

A report of the Senate Committee on Environment and Public Works accompanying the 1977 Clean Air Act amendments similarly explained that the previous structure that had been in place to address interstate pollution created a disadvantage for states that had stricter air pollution control requirements. S. REP. NO. 95-127, at 42 (1977), reprinted in 3 1977 LEGISLATIVE HISTORY OF THE CLEAN AIR ACT AMENDMENTS OF 1977, at 1415. The Senate Committee offered the example of the State of Ohio, which, despite being ordered by the 1970 amendments to the Clean Air Act to implement a plan to reduce emissions that would interfere with air quality standards, had not done so by 1976. Id. at 41-42. This situation caused emissions from plants in Ohio to be transported across the Ohio River to West Virginia, which was forced to cope with pollution "not generated by a source under its own control; [requiring] more stringent control of West Virginia sources to attain the ambient air quality standards." Id. at 42. The Committee concluded:

In the absence of interstate abatement procedures, those plants in States with more stringent control requirements are at a distinct

21

economic and competitive disadvantage. [Section 126(b)] is intended to equalize the positions of the States with respect to interstate pollution by making a source at least as responsible for polluting another State as it would be for polluting its own State.

Id.

This legislative history demonstrates that Congress viewed the Federal government as continuing to play an essential role in the fight against interstate pollution despite the fact that the states are the primary actors for implementing NAAQS and formulating SIPs. Congress recognized the importance of ensuring that the Federal government maintain its role in managing interstate air pollution, as the entity that "can and must provide the technical information and enforcement assistance that States and localities need." Id. at 10. Thus, we conclude that Section 126(b) was intended to allow the EPA, as a federal regulator, to intervene when states fail to adhere to the air pollution control process. This interpretation supports the EPA's construction of the statute.

Existing case law also supports the notion that the EPA has reasonably construed the statute. In New York v. EPA, 852 F.2d 574 (D.C. Cir. 1988), the D.C. Circuit interpreted a Section 126(b) petition to not obligate the EPA to review existing SIPs as part of the EPA's Section 126(b) enforcement process, as the "language of §126(b) is quite specific and focuses on 'major sources,' not the validity of a state's SIP." Id. at 578. This case supports the idea that the "prohibition" referred to in Section 126(b) is not dependent

22

on a standard established in a SIP that has already been approved or is in the process of being revised.

Similarly, in Connecticut v. EPA, 656 F.2d 902, 907 (2d Cir. 1981), the Second Circuit held that where a state files a Section 126(b) petition to challenge a proposed SIP revision of a neighboring state, completion of the Section 126(b) procedure is "not a prerequisite to EPA approval" of the SIP revision. Although it recognized that Sections 126(b) and 110 call for the same substantive inquiry, the court held that the two provisions are intended to be used in differing procedural settings and that one need not be a prerequisite to another. Id. at 907-08. Although the court also held that Section 126(b) "appears to have been primarily designed as a means for resolving interstate pollution disputes in situations where [a] SIP is not being revised," id. at 907 (emphasis added), we believe that the court was merely stating the primary intent of Section 126(b) and not necessarily its full scope and extent.

GenOn and UARG rely on EME Homer City Generation, L.P. v. EPA, 696 F.3d 7 (D.C. Cir. 2012), cert. granted, 570 U.S. __ (2013) for support, where the D.C. Circuit found that the EPA had exceeded its authority by issuing FIPs without first giving states the opportunity to implement the required reductions through SIPs or SIP revisions. Id. at 28-30. However, far from helping GenOn and UARG, language in this case actually supports the EPA's construction of the statute. See EME Homer, 696 F. 3d at 34 (stating that Section 126 is "a separate provision [from Section 110] that explicitly contemplates direct EPA regulation of specific sources that generate interstate pollution.").

23

The foregoing examination of the Clean Air Act's legislative history and applicable legal precedent support our finding that the EPA's construction of the statute is both permissible and reasonable so as to merit our deference under <u>Chevron</u>. For these reasons, we will deny the petition for review of the Portland Rule.

**C.     The EPA's Prior Interpretation of Section 126(b)**

GenOn and UARG also argue that the EPA's prior interpretation of the meaning of the "prohibition" referenced in Section 126(b) related to a SIP's failure to address interstate nonattainment and ran contrary to the EPA's current position. GenOn and UARG cite the EPA's issuance of a final rule in May 1999 governing ozone transport (the "May 1999 Rule"), where the EPA stated that it "interprets Section 126 to provide that a source is emitting in violation of the prohibition of section 110(a)(2)(D)(i) <u>where the applicable SIP fails to prohibit</u> . . . a quantity of emissions from that source that [the] EPA has determined contributes significantly to nonattainment or interferes with maintenance in a downwind state." Findings of Significant Contribution and Rulemaking on Section 126 Petitions for Purposes of Reducing Interstate Ozone Transport, 64 Fed. Reg. 28,250, 28,272 (May 25, 1999) (emphasis added).

The May 1999 Rule is not necessarily inconsistent with the EPA's current position. As part of the Portland rulemaking process, the EPA responded to this alleged inconsistency by noting that the May 1999 Rule was

24

prompted by an EPA determination that the elimination of excessive trans-boundary emissions would be obtained through a pending SIP call that was in play. Unlike the circumstances surrounding the issuance of the May 1999 Rule, there is no guarantee that an imminent SIP submission will manage the interstate sulfur dioxide transport problem stemming from Portland within the three-year time period required by Section 126. Therefore, immediate action under Section 126(b) is warranted in this case because no other mechanism, such as a pending SIP call, exists in these circumstances that would remedy the Portland problem.

Even if the May 1999 Rule is deemed inconsistent with the EPA's current interpretation, it does not undermine our decision to grant Chevron deference to the EPA's action. See generally Smiley v. Citibank, 517 U.S. 735, 742 (1996). A revised agency interpretation is still worthy of Chevron deference because "[a]n initial agency interpretation is not instantly carved in stone and the agency, to engage in informed rulemaking, must consider varying interpretations and the wisdom of its policy on a continuing basis." Rust v. Sullivan, 500 U.S. 173, 186 (1991) (internal quotations omitted) (citing Chevron, 467 U.S. at 863-64). The EPA is not forever held to its prior interpretations, as the continued validity and appropriateness of the agency's rules is an evolving process. For these reasons, we hold that the existence of a prior conflicting EPA interpretation does not have the effect of rendering the agency's current construction of the statute unreasonable in these circumstances.

> **D.** **Whether the Portland Rule is Arbitrary, Capricious, or Abusive of the EPA's Discretion**

25

Lastly, GenOn contends that the Portland Rule is arbitrary and capricious because it requires a reduction in sulfur dioxide emissions at Portland before requiring similar reductions from sources in New Jersey and prior to the time that SIPs addressing the new NAAQS are required. GenOn argues that it is arbitrary and capricious to require a single facility to address out-of-state nonattainment issues before other facilities are required to address the same problems.

We review the contents of the EPA's Portland Rule to determine whether it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law." 42 U.S.C. § 7607(d)(9)(A); North Carolina v. EPA, 531 F.3d 896, 906 (D.C. Cir. 2008). This is a narrow standard of review in which a court cannot substitute its judgment for that of the agency. Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto Ins. Co., 463 U.S. 29, 42-43 (1983). In reviewing agency action, we must ensure that, in reaching its decision, the agency "examined the relevant data and articulated a satisfactory explanation for its action, including a rational connection between the facts found and the choice made." Prometheus Radio Proj. v. FCC, 373 F.3d 372, 389-90 (3d Cir. 2004) (internal quotations omitted). Therefore, our review of an administrative agency's action is highly deferential, especially in the context of reviewing a federal agency's scientific determinations. New Jersey Envtl. Fed'n v. U.S. Nuclear Regulatory Comm'n, 645 F.3d 220, 228 (3d Cir. 2011).

Here, the Portland Rule was issued pursuant to the EPA's authority to find that "any major source or group of stationary sources" is emitting air pollution that violates

26

interstate pollution controls. 42 U.S.C. § 7426(b) (emphasis added). This language clearly dictates that direct federal regulation of a single source or facility is justified when the EPA makes a Section 126(b) finding. Once the EPA independently determined that Portland was contributing to nonattainment and interfering with New Jersey's air quality, it reasonably abided by the Clean Air Act in enacting the Portland Rule to require emissions reductions "as expeditiously as practicable, but in no case later than three years after the date of such finding." Id. § 7426(c). We find nothing arbitrary, capricious, or abusive about the EPA's discretion in imposing emissions reductions on a single source like Portland.

Further, we are satisfied after a review of the record that the EPA thoroughly examined the relevant scientific data and clearly articulated a "satisfactory explanation for its action, including a rational connection between the facts found and the choice made." Prometheus Radio, 373 F.3d at 389-90 (internal quotations omitted). The EPA examined the dispersion modeling results that New Jersey submitted with its Section 126(b) petition to show that emissions from Portland alone caused downwind violations of the 1-hour $SO_2$ NAAQS in New Jersey. Portland Rule, 76 Fed. Reg. at 69,057-59. The EPA also conducted its own modeling results and, in doing so, considered various components such as model selection and meteorological data, which supported its conclusion that the imposition of emissions limits on Portland would address New Jersey's nonattainment issues. Id. at 69,059-63. The portions of the EPA's Portland Rule that describe its methodology for the establishment of emissions limits and the increments of progress are extensive and well-documented. The EPA carefully calculated the emissions

27

reductions that were needed to eliminate Portland's contribution to nonattainment in New Jersey; the technical and economic feasibility of the emissions limits; and the appropriateness of imposing interim emissions limits towards achieving the final remedy.[6] Portland Rule, 76 Fed. Reg. at 69,063-75.

Moreover, the EPA published a proposed response to New Jersey's Section 126 petition on April 7, 2011. Proposed Rule, 76 Fed. Reg. at 19,662. The EPA solicited and received many public comments, and considered such comments during the course of conducting its findings. The EPA's responses to these public comments further elaborate the underlying technical details and justifications for its final plan of action, including the imposition of emission limits and the timing required for the changes. In the final Portland Rule, the EPA provided a thorough summary of the "significant changes" that it made since its initial proposal,

---

[6] Section 126(c) of the Clean Air Act gives the EPA authority to include "increments of progress" in the emissions limitations and compliance schedules required for a source subject to a Section 126(b) finding to continue operating beyond three months after such finding. 42 U.S.C. § 7426(c). Although "increments of progress" is not defined in the statute, it can only be interpreted to mean interim measures in the context of the emission limitations and compliance schedules. In any event, GenOn offers nothing to undermine the reasonableness of this interpretation of "increments of progress." Therefore, it is accorded deference under Chevron.

demonstrating that it took all suggestions into consideration to establish an effective remedy. Portland Rule, 76 Fed. Reg. at 69,053.

Based on the foregoing, the EPA set forth ample support that explains its rationale in promulgating the Portland Rule, establishing a rational connection between the facts that it found and the choice that it made. For these reasons, we hold that the EPA's action of promulgating the Portland Rule was neither an abuse of discretion nor arbitrary or capricious.

## III. CONCLUSION

For the foregoing reasons, we will uphold the EPA's Portland Rule and deny the petition for review. We hold that it was reasonable for the EPA to interpret Section 126(b) to be an independent mechanism for enforcing interstate pollution control, thereby giving it authority to promulgate the Portland Rule. We also hold that the contents of the Portland Rule are not arbitrary, capricious, or abusive of the EPA's discretion.