**PRECEDENTIAL**

IN THE UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 12-4216
_____

KRISTIE BELL; JOAN LUPPE,

Appellants

v.

CHESWICK GENERATING STATION, GENON POWER
MIDWEST, L.P.
_____

On Appeal from the United States District Court
for the Western District of Pennsylvania
(No. 2-12-cv-00929)
District Judge: Honorable Terrence F. McVerry
_____

Argued June 25, 2013

Before: FUENTES, FISHER, and CHAGARES, *Circuit
Judges*

(Opinion Filed:   August 20, 2013)

James E. DePasquale, Esq.
310 Grant Street
Suite 1302
Pittsburgh, PA 15219

Peter W. Macuga, II, Esq. **[ARGUED]**
Macuga & Liddle
975 East Jefferson Avenue
Detroit, MI 48207

*Counsel for Appellants*

Scott C. Oostdyk, Esq. **[ARGUED]**
McGuireWoods
901 East Cary Street
One James Center
Richmond, VA 23219

Paul K. Stockman, Esq.
McGuireWoods
625 Liberty Avenue
23rd Floor, Dominion Tower
Pittsburgh, PA 15222

*Counsel for Appellee*

Makram B. Jaber, Esq.
Allison D. Wood, Esq.
Hunton & Williams
2200 Pennsylvania Avenue, N.W.
Washington, DC 20037

*Counsel for Amicus Curiae Utility Air Regulatory Group in Support of Appellee*

_____

OPINION OF THE COURT
_____

FUENTES, *Circuit Judge*:

Kristie Bell and Joan Luppe are the named plaintiffs in a class action complaint (the "Complaint") filed against Cheswick Generating Station, GenOn Power Midwest, L.P. ("GenOn").[1] The putative class (the "Class") is made up of at least 1,500 individuals who own or inhabit residential property within one mile of GenOn's Cheswick Generating Station, a 570-megawatt coal-fired electrical generation facility in Springdale, Pennsylvania (the "Plant").

Complaining of ash and contaminants settling on their property, the Class brought suit against GenOn under several state law tort theories. GenOn argued that because the Plant

---

[1] The Complaint was filed in April 2012 in the Court of Common Pleas of Allegheny County, Pennsylvania. GenOn is a limited partnership organized under the laws of Delaware with its organizational headquarters and principal place of business in Houston, Texas. According to GenOn, "Cheswick Generating Station, GenOn Power Midwest, L.P." is not a legal entity. However, GenOn admits that it operates the Cheswick Generating Station. *See Bell v. Cheswick Generating Station*, 903 F. Supp. 2d 314, 314 n.1 (W.D. Pa. 2012). The error in the caption does not affect our ruling in any way.

was subject to comprehensive regulation under the Clean Air Act, it owed no extra duty to the members of the Class under state tort law. The District Court agreed with GenOn and dismissed the case. On appeal, we are faced with a matter of first impression: whether the Clean Air Act preempts state law tort claims brought by private property owners against a source of pollution located within the state. Based on the plain language of the Clean Air Act and controlling Supreme Court precedent, we conclude that such source state common law actions are not preempted. Accordingly, we reverse the decision of the District Court and remand the case for further proceedings.

## I. REGULATORY FRAMEWORK

### A. Environmental Regulation Under the Clean Air Act

The Clean Air Act, 42 U.S.C. § 7401 *et seq*., enacted in 1970, is a comprehensive federal law that regulates air emissions under the auspices of the United States Environmental Protection Agency ("EPA"). Congress enacted the law in response to evidence of the increasing amount of air pollution created by the industrialization and urbanization of the United States and its threat to public health and welfare. 42 U.S.C. § 7401(a)(2). The Clean Air Act states that air pollution prevention and control is the primary responsibility of individual states and local governments but that federal financial assistance and leadership is essential to accomplish these goals. *Id.* § 7401(a)(3)-(4). Thus, it employs a "cooperative federalism" structure under which the federal government develops baseline standards that the states individually implement and enforce. *GenOn Rema, LLC v. EPA*, No. 12-

4

1022, 2013 WL 3481486, at *1 (3d Cir. July 12, 2013). In so doing, states are expressly allowed to employ standards more stringent than those specified by the federal requirements. 42 U.S.C. § 7416.

The Clean Air Act makes the EPA responsible for developing acceptable national ambient air quality standards ("NAAQS"), which are meant to set a uniform level of air quality across the country in order to protect the populace and the environment. *Id.* § 7409(b)(1). Before such levels are adopted or modified by the EPA, "a reasonable time for interested persons to submit written comments" must be provided. *Id.* § 7409(a)(1)(B). The EPA itself does not typically regulate individual sources of emissions. Instead, decisions regarding how to meet NAAQS are left to individual states. *Id.* § 7410(a)(1). Pursuant to this goal, each state is required to create and submit to the EPA a State Implementation Plan ("SIP") which provides for implementation, maintenance, and enforcement of NAAQS within the state. *Id.* All SIPs must be submitted to the EPA for approval before they become final, and once a SIP is approved, "its requirements become federal law and are fully enforceable in federal court." *Her Majesty the Queen in Right of the Province of Ontario v. Detroit*, 874 F.2d 332, 335 (6th Cir. 1989) (citing 42 U.S.C. § 7604(a)).

States are tasked with enforcing the limitations they adopt in their SIPs. They must regulate all stationary sources located within the areas covered by the SIPs, 42 U.S.C. § 7410(a)(2)(C), and implement a mandatory permit program that limits the amounts and types of emissions that each stationary source is allowed to discharge, *id.* §§ 7661a(d)(1), 7661c(a). "[E]ach permit is intended to be a source-specific

bible for Clean Air Act compliance containing in a single, comprehensive set of documents, all [Clean Air Act] requirements relevant to the particular polluting source." *North Carolina, ex rel. Cooper v. Tenn. Valley Auth.*, 615 F.3d 291, 300 (4th Cir. 2010) (internal quotation marks omitted). Furthermore, pursuant to the federal Prevention of Significant Deterioration of Air Quality program in areas attaining NAAQS, "a covered source must, among other things, install the 'best available control technology [] for each pollutant subject to regulation . . . .'" *Coalition for Responsible Regulation, Inc. v. EPA*, 684 F.3d 102, 133 (D.C. Cir. 2012) (quoting 42 U.S.C. §7475(a)(4)).

**B.      Modes of Redress Under the CAA**

The Clean Air Act contains a "citizen suit" provision, *see* 42 U.S.C. § 7604, which permits the filing of civil suits in district courts "against any person . . . who is alleged to have violated . . . or to be in violation of (A) an emission standard or limitation under this chapter or (B) an order issued by the Administrator or a State with respect to such a standard or limitation." *Id.* § 7604(a)(1). The statute further grants a cause of action against the EPA if it fails to perform any non-discretionary responsibility, *id.* § 7604(a)(2), and also allows suit against any entity that constructs a source of emissions without securing the requisite permits. *Id.* § 7604(a)(3). Furthermore, the EPA "retains the power to inspect and monitor regulated sources, to impose administrative penalties for noncompliance, and to commence civil actions against polluters in federal court." *Am. Elec. Power Co., Inc. v. Connecticut*, 131 S. Ct. 2527, 2538 (2011).

The citizen suit provision contains a "savings clause" which provides, in pertinent part:

> Nothing in this section shall restrict any right which any person (or class of persons) may have under any statute or common law to seek enforcement of any emission standard or limitation or to seek any other relief (including relief against the Administrator or a State agency).

42 U.S.C. § 7604(e). This is the Clean Air Act's "citizen suit savings clause."

The Clean Air Act also contains a separate savings clause entitled "Retention of State authority," codified at 42 U.S.C. § 7416. This provision focuses on states' rights, and reads as follows:

> Except as otherwise provided . . . nothing in this chapter shall preclude or deny the right of any State or political subdivision thereof to adopt or enforce (1) any standard or limitation respecting emissions of air pollutants or (2) any requirement respecting control or abatement of air pollution . . . .

*Id.* § 7416. This is the Clean Air Act's "states' rights savings clause."

## C.  Regulation at the Cheswick Plant

Federal, state, and local authorities extensively regulate and comprehensively oversee the operations of the Cheswick Plant pursuant to their authority under the Clean Air Act.  The EPA, the Pennsylvania Department of Environmental Protection, and the Allegheny County Health Department comprise the administrative bodies that are primarily responsible for defining environmental emission standards and policing compliance with the Clean Air Act at the Plant.  As discussed above, at the EPA's direction and with its approval, states issue operating permits for all stationary sources under Subchapter V of the Clean Air Act. *See* 42 U.S.C. §§ 7661a-f.  Subchapter V program authority has in this instance been delegated to Allegheny County.  GenOn's Subchapter V permit for Cheswick (the "Permit") imposes limits on the emission of various particulate matter, gasses, chemical, and compounds from coal combustion. *See* App. 91-161.

The Permit collects all the operational requirements that are contained in Subchapter V of the Clean Air Act, and approved by the EPA.  It specifically provides that GenOn may not "operate . . . any source in such manner that emissions of malodorous matter from such source are perceptible beyond the property line," App. 106 (§ IV.3); must "take all reasonable actions to prevent fugitive air contaminants from becoming airborne," App. 112 (§ IV.19); may not "conduct . . . any materials handling operation in such manner that emissions from such operation are visible at or beyond the property line," App. 106 (§ IV.4); must ensure that "[a]ll air pollution control equipment" is "properly installed, maintained, and operated," App. 106 (§ IV.5); and

may not "operate any source . . . in such manner that emissions from such source . . . [m]ay reasonably be anticipated to endanger the public health, safety, or welfare." App. 96 (§ III.1).

However, it also provides that "nothing in this permit relieves the permittee from the obligation to comply with all applicable Federal, State and Local Laws and regulations," App. 96 (Declaration of Policy), and contains a savings clause which provides that:

> Nothing in this permit shall be construed as impairing any right or remedy now existing or hereafter created in equity, common law or statutory law with respect to air pollution, nor shall any court be deprived of such jurisdiction for the reason that such air pollution constitutes a violation of this permit.

App. 102 (§ III.31).

## II.    GENERAL FACTUAL AND PROCEDURAL OVERVIEW

### A.    The Complaint[2]

The Complaint alleges that GenOn's operation, maintenance, control, and use of the Plant releases

---

[2] The following factual allegations are taken from the Complaint, and we accept them as true for the purposes of this appeal.

malodorous substances and particulates[3] into the surrounding neighborhood, causing fly ash and unburned coal combustion byproducts to settle onto the Class members' property as a "black dust/film . . . or white powder" which requires constant cleaning. App. 9. These odors and particulates are harmful and noxious and have caused substantial damage to Class members' property and the loss of their ability to use and enjoy their properties, making them "prisoners in their [own] homes." App. 12. The operation of the Plant has been the subject of numerous and constant complaints by the residents of the surrounding neighborhood and by organizations and interested persons within the area. However, these complaints have not compelled GenOn to cease the improper operation of the Plant or to discontinue the ongoing invasion and trespass of the Class members' properties. The Complaint alleges that GenOn knows of the "improper construction, and operation of the [Plant], which allows discharge" of these particulates, yet "continues to operate the [Plant] without proper or best available technology, or any proper air pollution control equipment." App. 12-13.

Based on these allegations, the Class seeks to recover compensatory and punitive damages under three state common law tort theories: (1) nuisance; (2) negligence and

---

[3] These particulates include arsenic compounds, barium compounds, chromium compounds, copper compounds, dioxin and dioxin-like compounds, hydrochloric acid, hydrogen fluoride, lead compounds, manganese compounds, mercury compounds, nickel compounds, polycyclic aromatic compounds, sulfuric acid, vanadium compounds, and zinc compounds. App. 10-11.

recklessness; and (3) trespass.[4]  Although the Complaint also seeks injunctive relief on the nuisance and trespass counts, the Class admits that such relief would be limited to an order requiring GenOn to remove the particulate that continuously falls upon the Class members' properties.  Oral Arg. at 13:50; *Bell*, 903 F. Supp. 2d at 318.

## B.    The District Court Decision

In July 2012, GenOn removed the case to the Western District of Pennsylvania invoking the District Court's diversity jurisdiction, and promptly moved to dismiss the action on the grounds that the state law tort claims were preempted by the Clean Air Act.  It argued that allowing such claims to go forward "would undermine the [Clean Air Act]'s comprehensive scheme, and make it impossible for regulators to strike their desired balance in implementing emissions standards."  App. 84.  In October 2012 the District Court granted GenOn's motion, finding that the Clean Air Act preempted all of the Class's state law claims.

The District Court began by summarizing the extensive regulatory framework governing the Plant.  It then reviewed the Complaint and determined that "the allegations of Plaintiffs, as pleaded, assert various permit violations and seek a judicial examination of matters governed by the regulating administrative bodies."  *Bell*, 903 F. Supp. 2d at 320.  Thus, it moved on to examine "whether the Clean Air Act preempts the state common law claims or whether the

---

[4] The Class also asserted a strict liability claim, but has conceded that it must fail because power generation is not an ultra-hazardous activity.  *See Bell*, 903 F. Supp. 2d at 317.

11

savings clause in the citizen suit provision allow those claims to survive." *Id.* at 321. After discussing the relevant case law, the District Court concluded that, "[b]ased on the extensive and comprehensive regulations promulgated by the administrative bodies which govern air emissions from electrical generation facilities, the Court finds and rules that to permit the common law claims would be inconsistent with the dictates of the Clean Air Act." *Id.* at 322. The Court found that the "savings clause of the Clean Air Act does not alter this analysis." *Id.* The Class now appeals this decision.

## III.    DISCUSSION[5]

### A.    Preemption Analysis

The Supremacy Clause of the United States Constitution states:

> This Constitution, and the Laws of the United States which shall be made in Pursuance thereof . . . shall be the supreme Law of the Land; and the Judges in every State shall be bound

---

[5] The District Court had diversity jurisdiction pursuant to 28 U.S.C. § 1332. We have appellate jurisdiction under 28 U.S.C. § 1291. In reviewing a motion to dismiss, we must accept as true all well-pleaded facts and allegations, and must draw all reasonable inferences therefrom in favor of the plaintiff. *Monroe v. Beard,* 536 F.3d 198, 205 (3d Cir. 2008). A district court's order granting a motion to dismiss is given plenary review. *Grier v. Klem*, 591 F.3d 672, 676 (3d Cir. 2010).

> thereby, any Thing in the Constitution or Laws
> of any State to the Contrary notwithstanding.

U.S. Const. art. VI, cl. 2. The Supreme Court has interpreted the Supremacy Clause as preempting any state law that "interferes with or is contrary to federal law." *Free v. Bland*, 369 U.S. 663, 666 (1962). "Federal law can preempt state law in three ways: (1) express preemption, (2) field preemption, and (3) conflict preemption." *Farina v. Nokia*, 625 F.3d 97, 115 (3d Cir. 2010). "Conflict preemption nullifies state law inasmuch as it conflicts with federal law, either where compliance with both laws is impossible or where state law erects an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Id.* (internal quotation marks omitted). GenOn argues that state tort law conflicts with the objectives of the Clean Air Act, because it "would undermine the [Act]'s comprehensive scheme and rival the work of regulators as they strike their desired balance in implementing emissions standards." Appellee Br. at 26.

### 1.      Legal Precedent

While the extent to which the Clean Air Act preempts state law tort claims against an in-state source of pollution is a matter of first impression in this Circuit, the Supreme Court has addressed this issue in the context of a similarly comprehensive environmental statute: the Clean Water Act, 33 U.S.C. § 1251, *et seq.* In *International Paper Co. v. Ouellette*, 479 U.S. 481 (1987), the Court was asked to determine whether the Clean Water Act preempted a Vermont common law nuisance suit filed in Vermont state court, where the source of the alleged injury was located in New York.

Plaintiffs, a group of property owners who resided on the Vermont ("affected state") shore of Lake Champlain, alleged that the defendant paper company, which operated a pulp and paper mill on the New York ("source state") side of the lake, was discharging "effluents" into the lake, polluting the water and thereby diminishing the value of their property. *Id.* at 484. Defendants argued that the Clean Water Act preempted the court from applying Vermont state law against a source of pollution located in New York. In response, Plaintiffs argued that the Clean Water Act's savings clauses indicated "that Congress intended to preserve the right to bring suit under the law of any affected State." *Id.* at 493.

Like the Clean Air Act, the Clean Water Act contains two savings clauses, one located in the citizen suit provision, and another which focuses on states' rights. Section § 505(e) of the Clean Water Act, which is located in the Act's citizen suit provision, states:

> Nothing in this section shall restrict any right which any person (or class of persons) may have under any statute or common law to seek enforcement of any effluent standard or limitation or to seek any other relief . . . .

33 U.S.C. § 1365(e). Section 510 of the Clean Water Act focuses on states' rights, and provides:

> Except as expressly provided in this chapter, nothing in this chapter shall (1) preclude or deny the right of any State or political subdivision thereof or interstate agency to adopt or enforce (A) any standard or limitation

14

respecting discharges of pollutants, or (B) any requirement respecting control or abatement of pollution; . . . or (2) be construed as impairing or in any manner affecting any right or jurisdiction of the States with respect to the waters (including boundary waters) of such States.

*Id.* § 1370.

The *Ouellette* Court found that the Clean Water Act's savings clauses clearly preserved *some* state law tort actions, but that the text of the clauses did not provide a definitive answer to the question of whether suits based on the law of the *affected* state were preempted. 479 U.S. at 492, 497. However, it found definitively that "nothing in the [Clean Water Act] bars aggrieved individuals from bringing a nuisance claim pursuant to the laws of the *source* State." *Id.* at 497 (emphasis in original). The Court reasoned that, "[b]y its terms the Clean Water Act allows States . . . to impose higher standards on their own point sources," and "this authority may include the right to impose higher common-law as well as higher statutory restrictions." *Id.* (internal citation omitted). The Court acknowledged that a source state's "nuisance law may impose separate standards and thus create some tension with the permit system," but explained that this "would not frustrate the goals of the Clean Water Act," because "a source only is required to look to a single additional authority, whose rules should be relatively predictable." *Id.* at 498-99.[6] Thus, a suit by Vermont citizens

---

[6] Ultimately, the *Ouellette* Court concluded that "the [Clean Water Act] precludes a court from applying the law of an

15

would not be preempted if brought under the law of New York, the source state.

GenOn argues that *Ouellette* is distinguishable from this case because the savings clauses of the Clean Water Act are broader than the corresponding provisions in the Clean Air Act. However, a textual comparison of the two savings clauses at issue demonstrates there is no meaningful difference between them.

As the Supreme Court has acknowledged, and GenOn concedes, the citizen suit savings clause of the Clean Water Act is "virtually identical" to its counterpart in the Clean Air Act. *City of Milwaukee v. Illinois & Michigan*, 451 U.S. 304, 328 (1981); Appellee Br. at 30. Thus, GenOn's argument hinges on its expansive reading of the Clean Water Act's states' rights savings clause, which again provides:

> Except as expressly provided in this chapter, nothing in this chapter shall (1) preclude or deny the right of any State or political subdivision thereof or interstate agency to adopt or enforce (A) any standard or limitation respecting discharges of pollutants, or (B) any requirement respecting control or abatement of pollution; . . . *or (2) be construed as impairing*

affected State against an out-of-state source," *id.* at 494, reasoning that if "affected States were allowed to impose separate discharge standards on a single [out-of-state] point source, the inevitable result would be a serious interference with the achievement of the full purposes and objectives of Congress," *id.* at 493 (internal quotation marks omitted).

> *or in any manner affecting any right or jurisdiction of the States with respect to the waters (including boundary waters) of such States.*

33 U.S.C. § 1370 (emphasis added). By way of comparison, the states' rights savings clause of the Clean Air Act provides:

> Except as otherwise provided . . . nothing in this chapter shall preclude or deny the right of any State or political subdivision thereof to adopt or enforce (1) any standard or limitation respecting emissions of air pollutants or (2) any requirement respecting control or abatement of air pollution . . . .

42 U.S.C. § 7416. As a side-by-side comparison of the text indicates, the only meaningful difference between the two states' rights savings clauses is the portion of the Clean Water Act italicized above which refers to the boundary waters of the states. The reason why such language is not included the in Clean Air Act is clear: *there are no such jurisdictional boundaries or rights which apply to the air.* If anything, the absence of any language regarding state boundaries in the states' rights savings clause of the Clean Air Act indicates that Congress intended to preserve more rights for the states, rather than less. In no way can this omission be read to preempt all state law tort claims.

The only other circuit courts to have examined this issue in depth have also found no meaningful distinction between the Clean Water Act and the Clean Air Act. In *Her*

17

*Majesty the Queen in Right of the Province of Ontario v. Detroit*, 874 F.2d 332 (6th Cir. 1989), the Sixth Circuit held that the Clean Air Act did not preempt plaintiffs from suing the City of Detroit under the Michigan Environmental Protection Act ("MEPA"), finding that "the [Clean Air Act] displaces state law only to the extent that state law is not as strict as emission limitations established in the federal statute." *Id.* at 342 (emphasis removed from original). The court reasoned that "the plain language of the [Clean Air Act's] savings clause . . . clearly indicates that Congress did not wish to abolish state control," *id.* at 342-43, and, relying on *Ouellette*, concluded:

> If the plaintiffs succeed in state court, it will simply be an instance where a state is enacting and enforcing more stringent pollution controls as authorized by the [Clean Air Act]. With MEPA, the State of Michigan has created a mechanism under which more stringent limitations may be imposed than required by federal law. It is, by its terms, supplemental to other legal and administrative procedures and requirements, and in this case principles of comity and federalism require us to hold these MEPA actions are not preempted by federal law.

*Id.* at 344.

In *North Carolina ex rel. Cooper v. Tennessee Valley Authority*, 615 F.3d 291 (4th Cir. 2010), the state of North Carolina brought a state law public nuisance suit against the Tennessee Valley Authority ("TVA"), a federal agency which

18

owned and operated eleven coal-fired power plants located in Tennessee, Alabama, and Kentucky. After a bench trial, the District Court for the Western District of North Carolina issued an injunction against four of the TVA plants, imposing emission standards on the plants that were stricter than what was required by the Clean Air Act. On appeal, the Fourth Circuit reversed, finding that the district court had incorrectly applied the law of the affected state in violation of *Ouellette*, and that the TVA plants' emissions were not a public nuisance under the laws of the source states. In explaining its decision to apply *Ouellette*, the court noted that the savings clauses of the Clean Air Act and the Clean Water Act are "similar." *Id.* at 304. It also noted that the Clean Water Act is "similarly comprehensive" to the Clean Air Act, and that "[w]hile *Ouellette* involved a nuisance suit against a source regulated under the Clean Water Act, all parties agree its holding is equally applicable to the Clean Air Act." *Id.* at 306.

Ultimately, as commentators have recognized, "there is little basis for distinguishing the Clean Air Act from the Clean Water Act—the two statutes feature nearly identical savings clauses and employ similar 'cooperative federalism' structures." Scott Gallisdorfer, Note, *Clean Air Act Preemption of State Common Law: Greenhouse Gas Nuisance Claims After AEP v. Connecticut*, 99 Va. L. Rev. 131, 150 (2013). Both Acts establish a regulatory scheme through which source states, and not affected states, play the primary role in developing the regulations by which a particular source will be bound. Both Acts contain citizen suit provisions which allow individuals to bring suit to enforce their terms under certain circumstances, and both Acts contain two savings clauses: one located within the

citizen suit provision which focuses on the rights of individuals to sue, and a second independent savings clause which focuses on states' rights.

Given that we find no meaningful difference between the Clean Water Act and the Clean Air Act for the purposes of our preemption analysis, we conclude that the Supreme Court's decision in *Ouellette* controls this case, and thus, the Clean Air Act does not preempt state common law claims based on the law of the state where the source of the pollution is located.[7] Accordingly, the suit here, brought by Pennsylvania residents under Pennsylvania law against a source of pollution located in Pennsylvania, is not preempted.

## 2. Public Policy Considerations

GenOn argues that our holding may undermine the comprehensive regulatory structure established by the Clean

---

[7] The Supreme Court's recent decision in *American Electric Power Co. v. Connecticut*, 131 S. Ct. 2527 (2011), does nothing to alter our analysis. There, the Court held that the Clean Air Act displaced any federal common law right to seek abatement of carbon-dioxide emissions from power plants. *Id.* at 2537. However, the Court acknowledged that "[l]egislative displacement of federal common law does not require the same sort of evidence of clear and manifest [congressional] purpose demanded for preemption of state law," and explicitly left open the question of whether the Clean Air Act preempted state law. *Id.* at 2537, 2540; *see* Gallisdorfer, 99 Va. L. Rev. at 139 ("the displacement finding in [*American Electric*] hardly compels—or even presages—a corresponding finding of preemption").

Air Act by allowing the jury and the court to set emissions standards. Furthermore, amicus Utility Air Regulatory Group ("UARG") argues that allowing such cases to move forward would open the proverbial floodgates to nuisance claims against sources in full compliance with federal and state environmental standards, creating a patchwork of inconsistent standards across the country that would compromise Congress's carefully constructed cooperative federalism framework. Such inconsistency, it argues, would make it extremely difficult for sources to plan and operate, as they would never be sure of precisely what standards apply to their operations.

However, "[t]he Supreme Court addressed this precise problem" in *Ouellette*, *Cooper*, 615 F.3d at 301, and rejected the very same concerns that GenOn and UARG now raise. Indeed, while the *Ouellette* Court acknowledged that allowing "a number of different states to have independent and plenary regulatory authority over a single discharge would lead to chaotic confrontation between sovereign states," 479 U.S. at 496-97 (quoting *Illinois v. City of Milwaukee*, 731 F.2d 403, 414 (7th Cir. 1984)), it found that "[a]n action brought . . . under [source state] nuisance law would not frustrate the goals of the [Clean Water Act] as would a suit governed by [affected state] law," *id.* at 498. Its reasoning was straightforward:

> First, application of the source State's law does not disturb the balance among federal, source-state, and affected-state interests. Because the Act specifically allows source States to impose stricter standards, the imposition of source-state law does not disrupt the regulatory partnership

established by the permit system. Second, the restriction of suits to those brought under source-state nuisance law prevents a source from being subject to an indeterminate number of potential regulations. Although [source state] nuisance law may impose separate standards and thus create some tension with the permit system, a source only is required to look to a single additional authority, whose rules should be relatively predictable. Moreover, States can be expected to take into account their own nuisance laws in setting permit requirements.

*Id.* at 498-99.

Thus, the Court recognized that the requirements placed on sources of pollution through the "cooperative federalism" structure of the Clean Water Act served as a regulatory floor, not a ceiling, and expressly held that states are free to impose higher standards on their own sources of pollution, and that state tort law is a permissible way of doing so. *Id.* at 497-98. Indeed, courts in other circuits have affirmed decisions granting plaintiffs relief against sources of air pollution under state law nuisance theory. *See e.g.*, *Ellis v. Gallatin Steel Co.*, 390 F.3d 461 (6th Cir. 2004) (upholding award of injunctive relief and compensatory and punitive damages for violation of Kentucky nuisance law where "fugitive dust" from defendant's steel plant settled on plaintiffs' property).

## B.  Political Question Doctrine

GenOn argues in the alternative that the Class's claims should be barred by the political question doctrine based on the existence of the Clean Air Act. "The political question doctrine excludes from judicial review those controversies which revolve around policy choices and value determinations constitutionally committed for resolution to the halls of Congress or the confines of the Executive Branch." *Japan Whaling Ass'n v. Am. Cetacean Soc.*, 478 U.S. 221, 230 (1986). No court has ever held that such a constitutional commitment of authority regarding the redress of individual property rights for pollution exists in the legislative branch. Indeed, if such a commitment did exist, the Supreme Court would not have decided *Ouellette* in the first place. Accordingly, we reject this argument.

## III.  CONCLUSION

"In all pre-emption cases . . . we start with the assumption that the . . . powers of the States were not to be superseded by the Federal Act unless that was the clear and manifest purpose of Congress." *Medtronic, Inc., v. Lohr,* 518 U.S. 470, 485 (1996). We see nothing in the Clean Air Act to indicate that Congress intended to preempt source state common law tort claims. If Congress intended to eliminate such private causes of action, "its failure even to hint at" this result would be "spectacularly odd." *Id.* at 491. The Supreme Court's decision in *Ouellette* confirms this reading of the statute. Accordingly, we hold that the Class's claims are not preempted. We will reverse the decision of the District Court and remand this case for further proceedings.