RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)
File Name: 15a0261p.06

# UNITED STATES COURT OF APPEALS

FOR THE SIXTH CIRCUIT

---

BRUCE MERRICK, et al.,

> *Plaintiffs-Appellees,*

*v.*

DIAGEO AMERICAS SUPPLY, INC.,

> *Defendant-Appellant.*

No. 14-6198

---

Appeal from the United States District Court
for the Western District of Kentucky at Louisville.
No. 3:12-cv-00334—Charles R. Simpson III, District Judge.

Argued: August 6, 2015

Decided and Filed: November 2, 2015

Before: SILER, ROGERS, and STRANCH, Circuit Judges.

---

## COUNSEL

**ARGUED:** Ryan A. Shores, HUNTON & WILLIAMS LLP, Washington, D.C., for Appellant. William F. McMurry, WILLIAM F. MCMURRY & ASSOCIATES, Louisville, Kentucky, for Appellees. **ON BRIEF:** Ryan A. Shores, William L. Wehrum, Andrew D. Knudsen, HUNTON & WILLIAMS LLP, Washington, D.C., Walfrido J. Martinez, HUNTON & WILLIAMS LLP, New York, New York, John S. Reed, Rebecca A. Naser, Brooks D. Kubik, Megan L. Renwick, REED WEITKAMP SCHELL & VICE PLLC, Louisville, Kentucky, for Appellant. William F. McMurry, WILLIAM F. MCMURRY & ASSOCIATES, Louisville, Kentucky, Douglas H. Morris, Lea A. Player, MORRIS & PLAYER PLLC, Louisville, Kentucky, for Appellees. Peter D. Keisler, Quin M. Sorenson, SIDLEY AUSTIN LLP, Washington, D.C., J. Philip Calabrese, PORTER WRIGHT MORRIS & ARTHUR LLP, Cleveland, Ohio, Robert L. Brubaker, L. Bradfield Hughes, Eric B. Gallon, PORTER WRIGHT MORRIS & ARTHUR LLP, Columbus, Ohio, for Amici Curiae.

1

———————————

**OPINION**

———————————

ROGERS, Circuit Judge.  This interlocutory appeal concerns whether the federal Clean Air Act preempts common law claims brought against an emitter based on the law of the state in which the emitter operates.  The Clean Air Act's text makes clear that the Act does not preempt such claims.  This conclusion is further supported by the Act's structure and history, together with relevant Supreme Court precedents.

Diageo Americas Supply, Inc. distills and ages whiskey at its Louisville facilities.  The distillation and aging process results in tons of ethanol emissions.  Ethanol vapor from the facilities wafts onto nearby real and personal property where the ethanol combines with condensation to propagate whiskey fungus.  The whiskey fungus allegedly "creates an unsightly condition [on the property,] requiring abnormal and costly cleaning and maintenance, [and causes] early weathering of surfaces [and] unreasonable and substantial annoyance and unreasonable interference with the use and enjoyment of the property."

Ethanol emissions are regulated under the Clean Air Act.  As explained by the Third Circuit in a similar case, the Clean Air Act is:

> a comprehensive federal law that regulates air emissions under the auspices of the United States Environmental Protection Agency ("EPA").  Congress enacted the law in response to evidence of the increasing amount of air pollution created by the industrialization and urbanization of the United States and its threat to public health and welfare.  42 U.S.C. § 7401(a)(2).  The Clean Air Act states that air pollution prevention and control is the primary responsibility of individual states and local governments but that federal financial assistance and leadership is essential to accomplish these goals.  *Id.* § 7401(a)(3)–(4).  Thus, it employs a "cooperative federalism" structure under which the federal government develops baseline standards that the states individually implement and enforce.  In so doing, states are expressly allowed to employ standards more stringent than those specified by the federal requirements.  42 U.S.C. § 7416.
>
> The Clean Air Act makes the EPA responsible for developing acceptable national ambient air quality standards ("NAAQS"), which are meant to set a uniform level of air quality across the country in order to protect the populace and the environment.  *Id.* § 7409(b)(1).  Before such levels are adopted or modified by

the EPA, "a reasonable time for interested persons to submit written comments" must be provided. *Id.* § 7409(a)(1)(B). The EPA itself does not typically regulate individual sources of emissions. Instead, decisions regarding how to meet NAAQS are left to individual states. *Id.* § 7410(a)(1). Pursuant to this goal, each state is required to create and submit to the EPA a State Implementation Plan ("SIP") which provides for implementation, maintenance, and enforcement of NAAQS within the state. *Id.* All SIPs must be submitted to the EPA for approval before they become final, and once a SIP is approved, "its requirements become federal law and are fully enforceable in federal court." *Her Majesty the Queen in Right of the Province of Ontario v. Detroit*, 874 F.2d 332, 335 (6th Cir. 1989) (citing 42 U.S.C. § 7604(a)).

States are tasked with enforcing the limitations they adopt in their SIPs. They must regulate all stationary sources located within the areas covered by the SIPs, 42 U.S.C. § 7410(a)(2)(C), and implement a mandatory permit program that limits the amounts and types of emissions that each stationary source is allowed to discharge, *id.* §§ 7661a(d)(1), 7661c(a). "[E]ach permit is intended to be a source-specific bible for Clean Air Act compliance containing in a single, comprehensive set of documents, all [Clean Air Act] requirements relevant to the particular polluting source." *North Carolina, ex rel. Cooper v. Tenn. Valley Auth.*, 615 F.3d 291, 300 (4th Cir. 2010) (internal quotation marks omitted). Furthermore, pursuant to the federal Prevention of Significant Deterioration of Air Quality program in areas attaining NAAQS, "a covered source must, among other things, install the 'best available control technology [] for each pollutant subject to regulation . . . .'" *Coalition for Responsible Regulation, Inc. v. EPA*, 684 F.3d 102, 133 (D.C. Cir. 2012) (quoting 42 U.S.C. § 7475(a)(4)).

. . . .

The Clean Air Act contains a "citizen suit" provision, . . . [that in turn contains] a "savings clause" which provides, in pertinent part:

> Nothing in this section shall restrict any right which any person (or class of persons) may have under any statute or common law to seek enforcement of any emission standard or limitation or to seek any other relief (including relief against the Administrator or a State agency).

42 U.S.C. § 7604(e). This is the Clean Air Act's "citizen suit savings clause."

The Clean Air Act also contains a separate savings clause entitled "Retention of State authority," codified at 42 U.S.C. § 7416. This provision focuses on states' rights, and reads as follows:

> Except as otherwise provided . . . nothing in this chapter shall preclude or deny the right of any State or political subdivision thereof to adopt or enforce (1) any standard or limitation respecting emissions of air pollutants or (2) any requirement respecting control or abatement of air pollution . . . .

*Id.* § 7416.  This is the Clean Air Act's "states' rights savings clause."

*Bell v. Cheswick Generating Station*, 734 F.3d 188, 190–91 (3d Cir. 2013), *cert. denied sub nom. GenOn Power Midwest, L.P. v. Bell*, 134 S. Ct. 2696 (2014) (some internal citations omitted).

Diageo's Clean Air Act obligations with respect to the Louisville facilities are set out in the terms of a Federally Enforceable District Origin Operating Permit issued and overseen by the Louisville Metro Air Pollution Control District.  The permit prescribes detailed requirements for data collection, recordkeeping, and reporting.  It also expressly incorporates most of the regulations of the air pollution control district, including Regulation 1.09, which provides:

> No person shall permit or cause the emission of air pollutants which exceed the requirements of the District regulations or which cause injury, detriment, nuisance, or annoyance to any considerable number of persons or to the public or which endanger the comfort, repose, health, or safety of any such persons or the public or which cause or have a natural tendency to cause injury or damage to business or property.

Finally, the permit sets limits for emissions of various pollutants from the facilities.  For purposes of these limits, the permit distinguishes between fugitive and non-fugitive emissions. Fugitive emissions are those emissions that "could not reasonably pass through a stack, chimney, vent, or other functionally equivalent opening," *i.e.,* emissions that cannot reasonably be channeled through some kind of screening mechanism.  40 C.F.R. § 52.21(b)(20).  Non-fugitive emissions, by contrast, are those emissions that can reasonably be channeled through a screening mechanism.  For volatile organic compounds, including ethanol, the permit caps non-fugitive emissions at 100 tons per year.  The permit does not cap fugitive ethanol emissions, *i.e.*, those from Diageo's storage warehouses.

The plaintiffs in this case—owners, lessors, and renters of nearby properties affected by whiskey fungus—complained to the air pollution control district about the proliferation of whiskey fungus on their properties.  In response, the district undertook an investigation that resulted in the issuance of a Notice of Violation letter to Diageo on September 7, 2012.  In the letter, the district stated that, between June 2011 and May 2012, it received 27 complaints from residents living near the facilities of a "black, sooty substance covering . . . everything exposed to the outdoors."  The district found that Diageo had violated District Regulation 1.09 because:

Diageo caused and allowed the emission of an air pollutant which crossed its property line causing an injury and nuisance to nearby neighborhoods and the public. Diageo's warehouse emissions present a current and continuing threat to [the] public, endangering the comfort and repose of its neighbors. Diageo's warehouse emissions cause damage to nearby property and have the natural tendency to continue causing damage.

The Notice of Violation letter instructed Diageo to "submit to the District for approval a compliance plan for the abatement and control of emissions from its warehouses that are contributing to a nuisance, in accordance with District Regulation 1.12 by October 5, 2012." Diageo disputed that its operations at the facilities violated any district regulation, but nevertheless committed to vacating two of its whiskey aging warehouses to eliminate the problems of which plaintiffs complain. The record does not show whether Diageo followed through with its commitment and what effect, if any, that had on the growth of whiskey fungus on plaintiffs' properties.

In addition to complaining to the air pollution control district, plaintiffs filed a class action complaint in federal district court, seeking compensatory and punitive damages from Diageo for negligence, nuisance, and trespass, and an injunction requiring Diageo to abate its ethanol emissions by implementing certain control technologies at the facilities. Diageo moved to dismiss the complaint on two grounds. First, Diageo argued that it had no duty to curb ethanol emissions from its Louisville facilities. In support of this contention, Diageo relied on EPA decisions, agency actions from other jurisdictions, and its own permits. Second, in a notice of supplemental authority, Diageo argued that plaintiffs' claims were preempted by the Clean Air Act.

The district court largely rejected Diageo's arguments. Addressing Diageo's preemption argument first, the district court considered the Act's text in connection with decisions by the Supreme Court, this court, and other federal courts of appeals. The district court concluded that "Plaintiffs' state common law tort claims against Diageo are not preempted by the [Clean Air Act]."

The district court then addressed the sufficiency of the three state-law causes of action listed in the complaint, along with the claim for injunctive relief. In doing so, the district court

first considered plaintiffs' argument that, because Diageo had offered materials outside the pleadings—concerning its federal and state permits and the feasibility of implementing technologies to control its ethanol emissions—the district court was required to convert Diageo's motion to dismiss into a motion for summary judgment. The district court excluded the documents from its consideration, deciding that the documents "[were] not necessary for the resolution of the issues argued in Diageo's motion to dismiss." Because it had excluded the documents from consideration, the district court concluded, the documents did not obligate it to convert Diageo's motion to dismiss into a motion for summary judgment.

Turning to the substance of plaintiffs' state common law claims, the district court dismissed plaintiffs' negligence claim on the ground that plaintiffs had not pled facts sufficient to establish that Diageo owed them a duty of care, or that Diageo had breached that duty. The court denied Diageo's motion, however, with respect to plaintiffs' remaining causes of action, concluding that plaintiffs had alleged facts sufficient to establish nuisance and trespass, and to entitle them to injunctive relief.

On Diageo's motion, the district court certified its ruling for interlocutory appeal. A panel of this court granted the petition to appeal pursuant to 28 U.S.C. § 1292(b). On appeal, Diageo argues that plaintiffs' state common law claims conflict with the Clean Air Act methods for regulating emissions and, therefore, that allowing such claims to proceed would frustrate the purposes and objectives of the Act.

The states' rights savings clause of the Clean Air Act expressly preserves the state common law standards on which plaintiffs sue. The clause saves from preemption "the right of any State or political subdivision thereof to adopt or enforce (1) any standard or limitation respecting emissions of air pollutants or (2) any requirement respecting control or abatement of air pollution," except that the "State or political subdivision may not adopt or enforce any emission standard or limitation" that is "less stringent" than a standard or limitation under an applicable implementation plan or specified federal statute. 42 U.S.C. § 7416. State courts are arms of the "State," and the common law standards they adopt are "requirement[s] respecting control or abatement of air pollution." *Id.* Thus, the states' rights savings clause makes clear that states retain the right to "adopt or enforce" common law standards that apply to emissions.

A federal statute does not preempt state law if Congress did not intend the statute to do so, and "the best evidence of" Congress's intent "is the statutory text adopted by both Houses of Congress and submitted to the President." *W. Va. Univ. Hosps., Inc. v. Casey*, 499 U.S. 83, 98 (1991).

The phrase "any requirement," as used in the states' rights savings clause, clearly encompasses common law standards. As a four-Justice plurality of the Supreme Court has reasoned with respect to preempting language in a different statute, "[t]he phrase '[n]o requirement or prohibition' sweeps broadly and suggests no distinction between positive enactments and common law; to the contrary, those words easily encompass obligations that take the form of common law rules." *Cipollone v. Liggett Grp., Inc.*, 505 U.S. 504, 521 (1992) (plurality opinion). The phrase "any requirement" is similarly broad in its sweep, suggesting that it, too, encompasses common law rules. An expansive reading of "any requirement" is consistent, moreover, with the Court's historical tendency to treat common law standards as "requirements" for purposes of a variety of statutes. In *Bates v. Dow Agrosciences LLC*, for instance, the Court determined that the word "requirements" in the Federal Insecticide, Fungicide, and Rodenticide Act "reaches beyond positive enactments, such as statutes and regulations, to embrace common-law duties." 544 U.S. 431, 443 (2005). In *Riegel v. Medtronic, Inc.*, the Court concluded that common law causes of action for negligence and strict liability imposed "requirement[s]" for purposes of the Federal Food, Drug, and Cosmetic Act. 552 U.S. 312, 324 (2008). State common law standards therefore qualify as "requirements" for purposes of the Clean Air Act states' rights savings clause.

It is also plain that state courts are parts of the "State" for purposes of the states' rights savings clause. The states' rights savings clause implies that "State" refers to something that can "adopt or enforce . . . requirement[s]." State courts "adopt" state law "requirements" by making and modifying the common law, and state courts are the branch of state government most often tasked with "enforcing" state law "requirements." Indeed, the Supreme Court has interpreted the word "State" in the Clean Water Act states' rights savings clause, 33 U.S.C. § 1370(1)—which is

materially indistinguishable from the Clean Air Act states' rights savings clause,[1] *see Bell*, 734 F.3d at 195—to cover state courts and the common law rules they shape. *See Int'l Paper Co. v. Ouellette*, 479 U.S. 481, 497–98 (1987). The Court's interpretation of the word "State" in the Clean Water Act states' rights savings clause strongly indicates that the same word in the Clean Air Act states' rights saving clause, 42 U.S.C. § 7416, includes state courts. State common law standards are thus "requirements" adopted by "States," such that the Clean Air Act states' rights savings clause preserves them against preemption.

Other parts of the text of the Clean Air Act are fully consistent with this conclusion. For instance, Congress set out the Act's purposes and objectives in a section of the Act labeled "Congressional findings and declaration of purpose," which provides in part "that air pollution prevention (that is, the reduction or elimination, through any measures, of the amount of pollutants produced or created at the source) and air pollution control at its source is the primary responsibility of States and local governments." 42 U.S.C. § 7401(a)(3). Allowing states to apply their common law to emissions advances the Act's stated purposes by empowering states to address and curtail air pollution at its source. *See id.* at § 7401(a)(3), (c). Regulation of emissions under state common law, moreover, is consistent with Congress's declaration that it "is the primary responsibility of States" to prevent and reduce air pollution "*through any measures*." *Id.* at § 7401(a)(3) (emphasis added).

The legislative history of the Clean Air Act also indicates that it was not Congress's purpose to preempt state common law claims like those of the plaintiffs. For instance, the Report of the Senate Committee on Public Works explained that the citizen suit provision of the Clean Air Act "would specifically preserve any rights or remedies under any other law. Thus, if

---

[1]Diageo argues that the Clean Water Act states' rights savings clause is distinguishable from its Clean Air Act counterpart because the Clean Water Act states' rights savings clause contains the following sub-clause not found in the Clean Air Act states' rights savings clause:

> [N]othing in this chapter shall . . . be construed as impairing or in any manner affecting any right or jurisdiction of the States with respect to the waters (including boundary waters) of such States.

33 U.S.C. § 1370(2). That sub-clause is irrelevant for purposes of preemption because it does not purport to affect or expand the application of state common law under the Act. Rather, the sub-clause merely "preserve[s] the authority of each State to allocate water quantity as between users; [it does] not limit the scope of water pollution controls that may be imposed [by states] on users who have obtained, pursuant to state law, a water allocation." *PUD No. 1 of Jefferson Cnty. v. Wash. Dep't of Ecology*, 511 U.S. 700, 720 (1994). The sub-clause thus does not affect the symmetry, for purposes of preemption analysis, between the Clean Water Act states' rights savings clause and the Clean Air Act states' rights savings clause. *See Bell*, 734 F.3d at 195–97.

damages could be shown, other remedies would remain available. Compliance with standards under this Act would not be a defense to a common law action for pollution damages." S. Rep. No. 91-1196, at 38 (1970).

Supreme Court precedents interpreting and applying the Clean Water Act confirm that the Clean Air Act does not preempt plaintiffs' state common law claims. Clean Water Act precedents are persuasive with respect to the Clean Air Act because many provisions in the Clean Water Act—including the savings clauses—were modeled on the Clean Air Act, so that the two acts are often *in pari materia. United States v. Stauffer Chem. Co.*, 684 F.2d 1174, 1187 (6th Cir. 1982). As the Third Circuit has explained:

> [T]here is little basis for distinguishing the Clean Air Act from the Clean Water Act—the two statutes feature nearly identical savings clauses and employ similar 'cooperative federalism' structures. Both Acts establish a regulatory scheme through which source states, and not affected states, play the primary role in developing the regulations by which a particular source will be bound. Both Acts contain citizen suit provisions which allow individuals to bring suit to enforce their terms under certain circumstances, and both Acts contain two savings clauses: one located within the citizen suit provision which focuses on the rights of individuals to sue, and a second independent savings clause which focuses on states' rights.

*Bell*, 734 F.3d at 196 (internal quotation marks and citation omitted).

The Supreme Court has reasoned that the Clean Water Act preserves source state common law claims, even though it preempts application of source state common law claims to out-of-state sources:

> The saving clause specifically preserves other state actions, and therefore nothing in the Act bars aggrieved individuals from bringing a nuisance claim pursuant to the law of the *source* State. By its terms the CWA allows States . . . to impose higher standards on their own point sources, and in [*City of Milwaukee v. Illinois & Michigan*, 451 U.S. 304 (1981),] we recognized that this authority may include the right to impose higher common-law as well as higher statutory restrictions. 451 U.S. at 328 (suggesting that "States may adopt more stringent limitations . . . through state nuisance law, and apply them to in-state dischargers"); *see also Comm. for Jones Falls Sewage Sys. v. Train*, 539 F.2d 1006, 1009, and n.9 (4th Cir. 1976) (CWA preserves common-law suits filed in source State).

*Ouellette*, 479 U.S. at 497–98.   The *Ouellette* Court's interpretation of the Clean Water Act states' rights savings clause to preserve claims based on the law of the source state leads directly to the conclusion that the analogous states' rights savings clause in the Clean Air Act similarly preserves claims based on the law of the source state.

This conclusion is directly supported by holdings of the Third Circuit and the Iowa Supreme Court.  In cases materially indistinguishable from this one, those courts have held that the Clean Air Act does not preempt claims brought by plaintiffs under the common law of the source state.  *See Bell*, 734 F.3d at 196–98; *Freeman v. Grain Processing Corp.*, 848 N.W.2d 58, 80 (Iowa), *cert. denied*, 135 S. Ct. 712 (2014).  Diageo points to *North Carolina, ex rel. Cooper v. TVA*, 615 F.3d 291 (4th Cir. 2010), in which the Fourth Circuit held that the Clean Air Act preempted a plaintiff's state common law claims.  *Cooper*, however, did not involve claims under the common law of the source state.  Rather, *Cooper* involved claims against Alabama and Tennessee sources brought under North Carolina law.  *Id.* at 297.  That difference was dispositive on the preemption issue, for reasons having to do with federalism and the holding in *Ouellette*:

> [T]he district court's decision compromised principles of federalism by applying North Carolina law extraterritorially to TVA plants located in Alabama and Tennessee.  There is no question that the law of the states where emissions sources are located, in this case Alabama and Tennessee, applies in an interstate nuisance dispute.  The Supreme Court's decision in *Ouellette* is explicit: a "court must apply the law of the State in which the point source is located."  479 U.S. at 487.  While *Ouellette* involved a nuisance suit against a source regulated under the Clean Water Act, all parties agree its holding is equally applicable to the Clean Air Act.

*Id.* at 306.  The Fourth Circuit in *Cooper* applied the same framework the Third Circuit applied in *Bell* and the Iowa Supreme Court applied in *Freeman*.  All three courts distinguished between claims based on the common law of the source state—which are not preempted by the Clean Air Act—and claims based on the common law of a non-source state—which are preempted by the Clean Air Act.  Applying that framework here leads to the conclusion that the Clean Air Act does not preempt plaintiffs' claims.

The Supreme Court's decision in *American Electric Power Co. v. Connecticut* (*AEP*), 131 S. Ct. 2527 (2011), does not undermine that conclusion.  *AEP* involved a suit against "the

five largest emitters of carbon dioxide in the United States." *Id.* at 2534. The *AEP* plaintiffs alleged that, by contributing to global warming, "defendants' carbon-dioxide emissions created a 'substantial and unreasonable interference with public rights,' in violation of the federal common law of interstate nuisance," and sought injunctive relief through a court-ordered imposition of emissions caps. *Id.* The Supreme Court, however, held "that the Clean Air Act and the EPA actions it authorizes displace any federal common law right to seek abatement" of such emissions. *Id.* at 2537. In so holding, the Court emphasized two considerations. First, when it comes to setting federal emissions standards, the Act entrusts expert agencies, not courts, with primary decisionmaking authority. Second, relative to expert agencies, courts are ill suited to the complex balancing required in setting emissions standards. *Id.* at 2539–40.

Diageo argues that the Supreme Court's reasons for concluding that the Clean Air Act displaces federal common law all militate with equal force in favor of holding that the Act preempts state common law. There are fundamental differences, however, between displacement of federal common law by the Act and preemption of state common law by the Act. For one thing, the Clean Air Act expressly reserves for the states—including state courts—the right to prescribe requirements more stringent than those set under the Clean Air Act. 42 U.S.C. § 7416. The Act does not grant federal courts any similar authority.

In addition, the displacement of federal common law with applicable statutory law is a natural occurrence in a common law legal system where courts with jurisdiction over disputes must come up with legal principles in the absence of statutory rules of decision. *See AEP*, 131 S. Ct. at 2536. As the Supreme Court explained in *AEP*:

> "[W]hen Congress addresses a question previously governed by a decision rested on federal common law," the Court has explained, "the need for such an unusual exercise of law-making by federal courts disappears." Legislative displacement of federal common law does not require the "same sort of evidence of a clear and manifest [congressional] purpose" demanded for preemption of state law. "'[D]ue regard for the presuppositions of our embracing federal system . . . as a promoter of democracy,'" does not enter the calculus, for it is primarily the office of Congress, not the federal courts, to prescribe national policy in areas of special federal interest. The test for whether congressional legislation excludes the declaration of federal common law is simply whether the statute "speak[s] directly to [the] question" at issue.

*Id.* at 2537 (internal citations omitted).

The question whether state law is preempted demands due "regard for the presuppositions of our embracing federal system." *Id.* (internal citation omitted). When Congress acts to preempt state law—especially in areas of longstanding state concern—it treads on the states' customary prerogatives in ways that risk upsetting the traditional federal-state balance of authority. *See Geib v. Amoco Oil Co.*, 29 F.3d 1050, 1058 (6th Cir. 1994). This is why there is a strong presumption against federal preemption of state law, one that operates with special force in cases "in which Congress has legislated . . . in a field which the States have traditionally occupied." *Medtronic, Inc v. Lohr*, 518 U.S. 470, 485 (1996). Environmental regulation is a field that the states have traditionally occupied. *See Huron Portland Cement Co. v. City of Detroit*, 362 U.S. 440, 442 (1960). Accordingly, even if the express language of the states' rights savings clause here did not preserve state common law claims, principles of federalism and respect for states' rights would likely do so in the absence of a clear expression of such preemption.

Finally, the *AEP* Court itself explicitly stated that its holding was not dispositive of whether the Clean Air Act preempts state common law claims involving emissions.

> In light of our holding that the Clean Air Act displaces federal common law, the availability *vel non* of a state lawsuit depends, *inter alia*, on the preemptive effect of the federal Act. [*Ouellette*, 479 U.S.] at 489, 491, 497 (holding that the Clean Water Act does not preclude aggrieved individuals from bringing a "nuisance claim pursuant to the law of the *source* State"). None of the parties have briefed preemption or otherwise addressed the availability of a claim under state nuisance law. We therefore leave the matter open for consideration on remand.

*AEP*, 131 S. Ct. at 2540. The distinction the *AEP* Court drew—between displacement of federal law and preemption of common law—mirrors the distinction the Court drew in the context of the Clean Water Act. In *City of Milwaukee v. Illinois & Michigan*, 451 U.S. 304 (1981), the Court held that the Clean Water Act displaced federal common law governing water pollution because, by enacting a comprehensive federal water statute, Congress had supplanted federal common law. *See id.* at 322–25. The *AEP* Court's description of the structure and scope of the Clean Air Act closely mirrors the *City of Milwaukee* Court's description of the structure and scope of the Clean Water Act. Notwithstanding the displacement holding in *City of Milwaukee*, however, the Supreme Court subsequently held in *Ouellette* that the Clean Water Act does not preempt claims

based on source state common law. *See Ouellette*, 479 U.S. at 498–99. Given the parallels between the two acts, *City of Milwaukee* and *Ouellette* together indicate that *AEP*'s holding concerning displacement of federal common law does not support Clean Air Act preemption of source state common law. Indeed, the citation of *Ouellette* in *AEP* suggests the opposite conclusion: that the Clean Air Act does not preempt source state common law. For all of the foregoing reasons, *AEP* does not support Diageo's preemption arguments.

Many of Diageo's remaining arguments mistake regulatory overlap for regulatory conflict. The bare fact that Kentucky law may impose more stringent requirements than the Clean Air Act does not mean that the Act preempts Kentucky law. "The fact that a state has more stringent regulations than a federal law does not constitute conflict preemption." *Patriotic Veterans, Inc. v. Indiana*, 736 F.3d 1041, 1049 (7th Cir. 2013). "[S]tates frequently, and without preemption by federal law, create more stringent laws regarding minimum wage, employment discrimination, educational standards, gambling, and highway safety, to name a few." *Id.* Nor is Kentucky law preempted simply because it is the product of a less sophisticated or expert-driven process than that of the Clean Air Act. The question, for preemption purposes, is whether compliance with the state law defeats the purposes and objectives of the federal law, not whether the two laws impose different standards by different means. There is no evidence that Congress intended that all emissions regulation occur through the Clean Air Act's framework, such that any state law approach to emissions regulation would stand as an obstacle to Congress's objectives.

Diageo suggests that allowing state common law claims would "disrupt the CAA's balance of authority between federal and state law and conflict with the mechanism by which the CAA allows states to impose more stringent standards than the 'floor' established by federal law." The Supreme Court disposed of an identical argument in *Ouellette*, remarking that:

> An action brought against [a polluter] under [source-state] nuisance law would not frustrate the goals of the CWA as would a suit governed by [affected-state] law. [A]pplication of the source State's law does not disturb the balance among federal, source-state, and affected-state interests. Because the Act specifically allows source States to impose stricter standards, the imposition of source-state law does not disrupt the regulatory partnership established by the permit system.

479 U.S. at 498–99. What was true for the Clean Water Act holds true for the Clean Air Act.

We acknowledge the concern that a comprehensive federal scheme imposes substantial costs on industries, and that some suggest it is unduly burdensome for such industries to remain subject, in addition, to the requirements and remedies of state common law.  Such a concern must however be directed to Congress.  There is no basis in the Clean Air Act on which to hold that the source state common law claims of plaintiffs are preempted.

The order of the district court is affirmed.