RENDERED: SEPTEMBER 28, 2017
TO BE PUBLISHED

# Supreme Court of Kentucky

2014-SC-000717-DG

DATE 10/19/17 Kim Redmon, DC

BROWN-FORMAN CORPORATION AND
HEAVEN HILL DISTILLERIES, INC.

APPELLANTS

V.

ON REVIEW FROM COURT OF APPEALS
CASE NO. 2013-CA-002048-MR
JEFFERSON CIRCUIT COURT NO. 12-CI-003382

GEORGE MILLER

APPELLEE

**OPINION OF THE COURT BY JUSTICE WRIGHT**

**AFFIRMING IN PART AND REVERSING AND REMANDING IN PART**

## I. BACKGROUND

Appellee, George Miller,[1] owns property in Jefferson County near warehouses owned by Appellants, Brown-Forman Corporation and Heaven Hill Distilleries, Inc. (referred to collectively as Brown-Forman). Brown-Forman's warehouses contain barrels of aging bourbon.

Bourbon is a uniquely Kentucky liquor. The confluence of geology, geography, fertile soil, and availability of land helped birth the bourbon industry in Kentucky. The Commonwealth's easily accessible limestone water, abundance of oak trees, and expansive land—combined with a four-season climate conducive to growing corn and aging liquor in barrels—enabled Kentucky's nascent bourbon industry to grow and prosper. According to

---

[1] Several Appellees were originally involved in this case. However, all the Appellees apart from George Miller filed a motion to dismiss, which this Court granted.

Brown-Forman, as of 2014, Kentucky distillers produce 95% of bourbon worldwide.

Bourbon's enticing characteristics come from distilling a unique combination of ingredients and the use of a distinct aging process. 27 C.F.R. § 5.22. Before being labelled bourbon, the distilled spirit must be aged a minimum of two-years in new charred-oak barrels. *Id.* This distinct aging process is at the epicenter of this dispute.

During the aging process, Brown-Forman uses warehouses in Jefferson County to store its barrels of bourbon. As it ages, the bourbon interacts with the barrel as the liquid expands and contracts based on ambient temperature and air-flow. Warmer temperatures cause the bourbon to expand and seep further into the barrel, while colder temperatures cause contraction and less contact with the barrel. Movement into and out of the wood over time gives bourbon its color and taste.

Miller's complaint centers around fugitive ethanol emissions (the so-called "angels' share") that escape from the barrels during this aging process. These fugitive emissions promote the growth of the *Baudoinia compniacensis* fungus (colloquially referred to as "whiskey fungus"). Miller alleges the whiskey fungus causes a black film-like substance to proliferate on his property, covering virtually all outdoor surfaces—including wood, vinyl, metal, and concrete.

Miller filed suit in Jefferson County seeking damages based on several state tort theories and injunctive relief. Brown-Forman filed a motion to dismiss for failure to state a claim upon which relief could be granted. The trial court granted Brown-Forman's motion to dismiss, as it determined the

2

federal Clean Air Act preempted Miller's claims. Miller appealed and the Court of Appeals reversed and remanded, holding that the Act did not preempt Miller's claims. This Court granted Brown-Forman's motion for discretionary review.

For reasons that follow, we affirm the Court of Appeals insofar as it held that the trial court erred in granting Brown-Forman's motion to dismiss the state tort claims for damages, as we agree these claims are not preempted by the Act. However, we reverse the Court of Appeals' holding regarding Miller's injunctive relief. While we disagree with the trial court that the Act preempted the injunctive relief, we hold that the injunctive relief was inappropriate for other reasons.

## II. STANDARD OF REVIEW

We begin our analysis by looking through the lens of the proper standard of review. A trial court should dismiss an action for failure to state a claim upon which relief may be granted only when "it appears the pleading party would not be entitled to relief under any set of facts which could be proved . . . ." *Pari-Mutuel Clerks' Union Local 541 v. Kentucky Jockey Club*, 551 S.W.2d 801, 803 (Ky. 1977). "In ruling on a motion to dismiss, the pleadings should be liberally construed in the light most favorable to the plaintiff, all allegations being taken as true." *Morgan v. Bird*, 289 S.W.3d 222, 226 (Ky. App. 2009). "This exacting standard of review eliminates any need by the trial court to make findings of fact; rather, the question is purely a matter of law. Stated another way, the court must ask if the facts alleged in the complaint can be proved, would the plaintiff be entitled to relief?" *Fox v. Grayson*, 317 S.W.3d 1,

3

7 (Ky. 2010) (quoting *James v. Wilson*, 95 S.W.3d 875, 884 (Ky. App. 2002)). Appellate courts review questions of law such as this de novo, affording no deference to the trial court. *Id.* at 7.

In conducting this de novo review, we must decide two separate, but related, legal questions. First, we must determine whether the Clean Air Act preempts Miller's state law tort claims seeking damages. Then, we must determine whether a trial court may issue an injunction such as the one Miller sought.

## III. ANALYSIS

### A. Clean Air Act

We will first look to the federal act on which this litigation hinges. In passing the Clean Air Act, Congress delegated its implementation and administration to the federal Environmental Protection Agency (EPA). However, Congress also specifically designated a role for states.

Under the Act, each state may adopt a State Implementation Plan setting out emission limitations, emission standards, and other requirements to meet the National Ambient Air Quality Standards established by the EPA. 42 U.S.C. § 7410. States submit their individual plans to the EPA Administrator for approval. 42 U.S.C. § 7410(a)(1). The Act sets out the contents and the authority states must possess before the Administrator may approve a State Plan. 42 U.S.C. § 7410(a)(1)-(2).

After significant amendments to the Clean Air Act in 1990, Congress allowed the Administrator to authorize state and local governments (called permitting authorities) to issue operating permits. 42 U.S.C. § 7661. The Act

defines the requisite legal authority each permitting authority must possess, prescribes the process for judicial review of permitting decisions, and allows the EPA to promulgate other requirements. 42 U.S.C. § 7661a(b). Once a permitting authority's plan satisfies those requirements, then the Administrator may authorize it to issue permits under the Act.

In Jefferson County, the Administrator specifically authorized the Louisville Metro Air Pollution Control District (Metro District) to issue operating permits. 40 C.F.R. § 70, App. A—Kentucky. The Administrator also approved Kentucky's State Plan, which includes Metro District's regulations. 40 C.F.R. § 52.923. Brown-Forman and Heaven Hill both maintain permits, and Miller does not allege either distiller is in violation of its operating permit; therefore, we proceed under the premise that the companies are in full compliance with the requisite permits mandated by the Act.

### 1. Federal Preemption

"The Supremacy Clause makes the laws of the United States 'the supreme Law of the Land . . . any Thing in the Constitution or Laws of any State to the Contrary notwithstanding.'" *Hughes v. Talen Energy Mktg.*, 136 S. Ct. 1288, 1297 (2016) (quoting U.S. Const. art. VI, cl. 2). The Supremacy Clause binds this Court and requires that we give precedence to lawful federal enactments over the laws of the Commonwealth. "[T]he states have no power, by taxation *or otherwise*, to retard, impede, burden, or in any manner control, the operations of the constitutional laws enacted by congress to carry into execution the powers vested in the general government." *M'Culloch v. Maryland*, 17 U.S. 316, 436 (1819) (emphasis added). "Put simply, federal law preempts contrary state law." *Hughes*, 136 S. Ct. at 1297. State law is

5

contrary "to the extent of any conflict with a federal statute." *Crosby v. Nat'l Foreign Trade Council*, 530 U.S. 363, 372 (2000). Notably, this occurs "where, under the circumstances of a particular case, the challenged state law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Hughes*, 136 S. Ct. at 1297 (citing *Crosby*, 530 U.S. at 373). Chief Justice John Marshall recognized nearly two centuries ago that "[i]t is of the very essence of supremacy, to remove all obstacles to its action within its own sphere, and so to modify every power vested in subordinate governments, as to exempt its own operations from their own influence." *M'Culloch*, 17 U.S. at 427.

With that in mind, we turn back to the federal Clean Air Act, which seeks to strike a balance between encouraging economic development and protecting the environment—a task here entrusted to both the Metro District and EPA. Specifically, in taking a cost-benefit approach, the Act directs the Administrator to "consider all of the economic, public health, and environmental benefits of efforts to comply with such standard," 42 U.S.C. § 7612(b), as well as "the effects of such standard on employment, productivity, cost of living, economic growth, and the overall economy," 42 U.S.C. § 7612(c).

After this careful balancing was taken into account, Brown-Forman and Heaven Hill were issued separate kinds of permits based on the amount of air pollutants each releases. Brown-Forman operates under a Title V permit, which is required for stationary sources emitting 100 tons per year or more of any non-fugitive air pollutant. *See* U.S.C. §§ 7661 et seq.; 40 C.F.R. § 70; Metro Dist. Regulation 2.16. Since Heaven Hill emits less than 100 tons of non-fugitive air pollutants per year, it holds a Federal Enforceable District

6

Origin Operating Permit. *See* Metro Dist. Regulation 2.17. Because no party argues otherwise, we make no distinction in our analysis between the two types of permits.

### 2. *Savings Clauses*

In determining whether the Act preempts any or all of Miller's claims, we must construe the Act as a whole and give effect to two separate savings clauses. These savings clauses allow states to retain power in spite of the Act's other provisions. In these clauses, Congress declared that certain types of conflicts between the Act and state law that might otherwise be preempted should, instead, be tolerated.

Specifically, 42 U.S.C. § 7416 reserves to the states the power to adopt and enforce more stringent standards than those established by the Act. That clause reads:

> [N]othing in this chapter shall preclude or deny the right of any State or political subdivision thereof to adopt or enforce (1) any standard or limitation respecting emissions of air pollutants or (2) any requirement respecting control or abatement of air pollution; except that if an emission standard or limitation is in effect under an applicable implementation plan or under section 7411 or section 7412 of this title, such State or political subdivision may not adopt or enforce any emission standard or limitation which is less stringent than the standard or limitation under such plan or section.

*Id.*

The second savings clause appears in 42 U.S.C. §7604 and grants individuals the power to commence citizen suits to enforce the Act. While we acknowledge that Miller did not bring a citizen suit, §7604 also covers other actions. In particular, the subsection titled "Nonrestriction of other rights" (as in, rights other than citizen suits) states: "Nothing in this section shall restrict

7

*any right* which any person (or class of persons) may have under *any statute or common law* to seek enforcement of any emission standard or limitation or to seek any other relief (including relief against the Administrator or a State agency)." 42 U.S.C. § 7604(e).

## B.    State Tort Claims

Again, this case is before us on the trial court's order to dismiss Miller's case for failure to state a claim upon which relief can be granted. At the trial court, Miller sought damages under state tort theories of negligence, trespass, and nuisance. In granting Brown-Forman's motion, the trial court determined all claims were preempted by the Clean Air Act. Our holding on this issue is limited to whether—as a matter of law—the action can proceed despite Brown-Forman's preemption argument. We pass no judgment on the merits of Miller's tort actions.

To ascertain the Act's preemptive effect on Miller's state tort claims, we find a recent Sixth Circuit case persuasive. In *Merrick v. Diageo Americas Supply, Inc.*, 805 F.3d 685, 686 (6th Cir. 2015), the Sixth Circuit concluded that the Clean Air Act does not preempt common law claims brought against an emitter based on the law of the state in which the emitter operates. The same individual, Merrick, brought both the case considered by the Sixth Circuit and the case underlying the present action (though he has since been dismissed as a party herein). In the Sixth Circuit case, Merrick brought a similar putative class action against Diageo Americas Supply, Inc. *Id.* at 686. There, the plaintiffs alleged that in the course of Diageo's distilling and aging whiskey at its Louisville facility, large amounts of ethanol are emitted. Just as in the present case, the plaintiffs alleged those emissions waft onto nearby real

8

and personal property where, when combined with condensation, create whiskey fungus. *Id.* The plaintiffs in *Merrick* alleged this whiskey fungus constituted a substantial annoyance and an unreasonable interference with the use and enjoyment of their property. *Id.* at 687.

In *Merrick*, the class action plaintiffs sought compensatory and punitive damages for negligence, nuisance, and trespass, along with an injunction requiring Diageo to abate its ethanol emissions through implementing certain control technology at the facilities. *Id.* at 698. In responding to the suit, Diageo argued that all of the plaintiffs' claims were preempted by the Clean Air Act. *Id.* The district court dismissed the negligence claim, finding the plaintiffs had not pled sufficient facts to establish they were owed a duty of care that was breached, but otherwise the lower court allowed the state law claims to proceed. *Id.* Subsequently, Diageo sought interlocutory review by the Sixth Circuit. *Id.* at 690.

First, the Sixth Circuit concluded that the states' rights savings clause of the Clean Air Act expressly preserved the state common law standards under which the plaintiffs had sued. *Id.* The Sixth Circuit determined that "[s]tate courts are arms of the 'State,'" and that the phrase "any requirement," employed in the states' rights savings clause, clearly covered common law standards adopted by those state courts. *Id.*

Second, beyond the savings clause of the Clean Air Act, the Sixth Circuit observed that permitting states to apply their common law to emissions advanced the Act's stated purpose, "by empowering states to address and curtail air pollution at its source." *Id.* at 691. Further, the Sixth Circuit noted that the legislative history of the Clean Air Act made clear that Congress did

9

not intend to preempt state common law claims, like those raised by the Plaintiffs. *Id.* Specifically, the Report of the Senate Committee on Public Works reflects that the "citizen suits" provision of the Clean Air Act, "would specifically preserve any rights or remedies under any other law. Thus, if damages could be shown, other remedies would remain available. Compliance with standards under this Act would not be a defense to a common law action for pollution damages." *Id.* (quoting S.Rep. No. 91-1196 at 38 (1970)).

Looking beyond the text and history of the Act, the Sixth Circuit noted that Supreme Court precedent regarding the Clean Water Act was persuasive authority since the Clean Water Act was modeled on the Clean Air Act and "the two acts are often '*in pari materia.*'" *Id.* at 692. In *Int'l Paper Co. v. Ouellette,* 479 U.S. 481 (1987), the Supreme Court held that the nearly identical states' rights savings clause in the Clean Water Act specifically preserved common law claims brought by aggrieved individuals against "sources" of water pollution in their own state (as opposed to out-of-state sources). As the Sixth Circuit appropriately found, "[t]he *Ouellette* Court's interpretation of the Clean Water Act's states' rights savings clause to preserve claims based on the law of the source state leads directly to the conclusion that the analogous states' rights savings clause in the Clean Air Act similarly preserves claims based on the law of the source state." *Id.* at 692.

The conclusion that the Clean Air Act does not preempt state common law claims also finds support, as the Sixth Circuit noted, in the Third Circuit's decision in *Bell v. Cheswick Generating Station,* 734 F.3d 188, 192–93 (3d Cir. 2013), and the Supreme Court of Iowa's decision in *Freeman v. Grain Processing Corp.,* 848 N.W.2d 58, 80 (Iowa 2014). *Id.* In *North Carolina ex rel.*

10

*Cooper v. Tennessee Valley Authority,* 615 F.3d 291 (4th Cir. 2010), the Fourth Circuit Court of Appeals found preemption of state law claims—but under markedly different circumstances, *i.e.,* where North Carolina brought claims under North Carolina law against companies located in Alabama and Tennessee. Noting that the result in that case was due to issues of federalism and the Supreme Court's holding in *Ouellette,* the Sixth Circuit noted that the *Cooper* result was actually consistent with *Bell* and *Freeman. Id.* Indeed, the Sixth Circuit explained that "[a]ll three courts distinguished between claims based on the common law of the source state—which are not preempted by the Clean Air Act—and claims based on the common law of a non-source state—which are preempted by the Clean Air Act." *Id.* at 693.

Finally, the *Merrick* Court noted there is a strong presumption against federal preemption of state law, "one that operates with special force in cases in which Congress has legislated . . . in a field which the States have traditionally occupied." *Id.* at 694 (citing *Medtronic, Inc. v. Lohr,* 518 U.S. 470, 485 (1996)). Given that states have traditionally occupied the field of environmental regulation, the Sixth Circuit opined that even without the Clean Air Act's states' rights savings clause, state common law claims would likely be preserved under "principles of federalism and respect for states' rights." *Id.*

In sum, the text of the Clean Air Act and its legislative history, Supreme Court precedent construing the virtually identical provisions of the Clean Water Act, persuasive opinions from other federal courts and a state court, and the strong presumption against preemption in the field of environmental regulation, all led to the Sixth Circuit's rejection of preemption arguments by

11

Diageo. We agree and adopt the Sixth Circuit's analysis as to this issue. Thus, we affirm the Court of Appeals insofar as it held that the Clean Air Act did not preempt Wilson's state tort causes of action.

### 3. *Monetary Damages*

We further hold that the Act does not preempt a trial court from awarding monetary damages on state tort causes of action. Awarding damages for a particular harm to specific property in no way "retard[s], impede[s], burden[s], or in any manner control[s], the operations" of the Act. *M'Culloch*, 17 U.S. at 436. Nor does it "stand[] as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Hughes*, 136 S. Ct. at 1297.

An award of monetary damages to an aggrieved party fundamentally differs from supplanting a permitting decision of an expert agency. This is primarily so because "the [Act] does not provide damage remedies to harmed individuals." *Freeman*, 848 N.W.2d at 69. Monetary damages also withstand scrutiny in part because "'personalized' remedies are not a first priority of the Act." *Ellis v. Gallatin Steel Co.*, 390 F.3d 461, 477 (6th Cir. 2004).

To be sure, the Supreme Court in *American Electric Power Co. v. Connecticut*, 564 U.S. 410, 426 (2011), held that a public nuisance claim was preempted because the Act displaced *federal* common law. But in doing so, the Court made clear that its analysis of federal common law differed from that of state law. Specifically, it stated: "Legislative displacement of federal common law does not require the same sort of evidence of a clear and manifest congressional purpose demanded for preemption of state law." *Id.* at 423 (quotation marks and brackets omitted).

12

Furthermore, that case rests upon the premise that under the Act, the duty to prevent and abate public nuisances is vested in the EPA and permitting authorities. The regulatory regime created by the Act supplants federal public nuisance claims because the Act incorporates those same types of protections against generalized harm.[2] However, the case at bar differs from *American Electric Power*. The nuisance at issue here is a private nuisance claim under state tort law, rather than a public nuisance claim under federal common law. (It is a claim from damages caused by specific harm to specific property rather than general harm.) In *Bell*, 734 F.3d at 192–93, the Third Circuit distinguished private nuisance state tort actions and determined that the Act did not preempt the plaintiff's private nuisance and trespass claims seeking monetary damages.

The Act does not provide a mechanism for awarding monetary compensation to an injured party suffering from a particularized harm. "Thus, a property owner seeking full compensation for harm related to the use and enjoyment of property at a specific location must resort to common law or state law theories to obtain a full recovery." *Freeman*, 848 N.W.2d at 70.

We agree with the Iowa Supreme Court that "state common law and nuisance actions have a different purpose than the regulatory regime

---

[2] In 42 U.S.C. § 7602, Congress declared that "[a]ll language referring to effects on welfare includes . . . damage to and deterioration of property." While we acknowledge that several provisions in the Act refer to welfare, and by extension to damage and deterioration of property, we read this to apply generally to all property to the extent protected by the duty imposed under a theory of public nuisance. We do not read this to protect discrete private property to the same extent as the duty imposed under a theory of private nuisance because the Act also requires the balancing of interests, of which preventing damage and deterioration of property is but one.

13

established by the [Act]. The purpose of state nuisance and common law actions is to protect the use and enjoyment of specific property, not to achieve a general regulatory purpose." *Id.* at 84. Like the plaintiffs in *Freeman*, Miller here "seek[s] damages related to specific properties at specific locations allegedly caused by a specific source." *Id.* at 85. The purpose and function of the Act differs sufficiently from the purpose and function of "a private lawsuit seeking damages anchored in ownership of real property," *id.*, to avoid issues of conflict preemption.

The Act does not state that Congress intended to prevent injured property owners suffering particularized harm from recovering monetary damages under state law. Absent such language or a vividly demonstrable obstacle to the Act's operation, we cannot conclude it preempts state trial courts from awarding monetary damages in tort actions for negligence, private nuisance, or trespass.

As noted above, the specifics of Miller's state tort claims are not currently before this Court. Whether those causes of action ultimately succeed is a matter to be determined at trial. We hold only that the Act does not preempt Miller's state law tort claims seeking damages and remand this matter to the trial court for further proceedings.

## C. Injunction

The injunction Miller sought from the trial court would have required Brown-Forman to implement pollution-control technology not required by its permit issued under the Clean Air Act. We must first determine if the Act preempts this type of injunctive relief. In doing so, we must construe the Act as a whole because "[c]ourts have a duty to construe statutes, not isolated

14

provisions." *Graham Cty. Soil & Water Conservation Dist. v. United States ex rel. Wilson*, 559 U.S. 280, 290 (2010) (internal citations and quotation marks omitted). This means we cannot read a section quarantined from the Act's overall context. We will first turn to the second of the Act's savings clauses (the citizen-suit clause discussed above) to determine if the Act saved the powers in question for the states.

In construing the citizen-suit provision of the Clean Water Act in *City of Milwaukee v. Illinois*, the Supreme Court said:

> Subsection 505(e) is virtually identical to subsections in the citizen-suit provisions of several environmental statutes. The subsection is common language accompanying citizen-suit provisions and we think that it means only that the provision of such suit does not revoke other remedies. It most assuredly cannot be read to mean that the Act as a whole does not supplant formerly available federal common-law actions but only that the particular section authorizing citizen suits does not do so.

451 U.S. 304, 328–29 (1981) (footnote omitted). We acknowledge that, in that case, the Supreme Court was interpreting the citizen-suit provision of the Clean Water Act, not the Clean Air Act. In doing so, however, the Court specifically cited the "virtually identical" citizen-suit provision appearing in the Clean Air Act.

We adopt the Supreme Court's reasoning interpreting the Clean Water Act as applying with equal force to the Clean Air Act. First, Congress's creation of the citizen suit as a statutory remedy does not limit remedies otherwise available. Nothing in the section authorizing citizen suits, 42 U.S.C. § 7604, revokes other available remedies, including injunctive relief linked to state tort law. In other words, Congress did not intend citizen suits to be an exclusive remedy. Therefore, the Clean Air Act does not preempt state injunctive relief.

15

However, even though injunctive relief is not preempted by the Act, it is still unavailable in this case. The Act and Kentucky regulations provide for citizen input in the permitting process. The permit is issued only after careful balancing of the economic and environmental impact. So long as companies operate within the bounds of their permits concerning air pollutants (which is not contested in the case at bar), injunctive relief for an alleged nuisance is not an appropriate remedy.[3] Here, by seeking an injunction demanding a particular pollution-control technology, Miller asked the trial court to second-guess the reasonableness of a decision the Act undeniably entrusted to Metro District and the EPA. As previously noted, the Act directs the EPA Administrator to "consider all of the economic, public health, and environmental benefits of efforts to comply with such standard," 42 U.S.C. § 7612(b), as well as "the effects of such standard on employment, productivity, cost of living, economic growth, and the overall economy," 42 U.S.C. § 7612(c). In making the decision to issue the permits, citizens have the opportunity for input. The agency made a specific determination which balanced the risks to the environment with the economic impact of any pollution-control measures. For the trial court to issue the injunction Miller seeks would impose higher standards than the Clean Air Act requires.

Furthermore, while the Act's states' rights savings clause, 42 U.S.C. § 7416, specifically reserves to the states the power to adopt and enforce more

---

[3] Our holding is limited to injunctive relief in nuisance cases where the regulatory authority (in this case, both federal and state) has issued a permit after carefully balancing environmental and economic factors. Issuing an injunction to require different technology to prevent a nuisance is markedly different from issuing an injunction for other purposes, such as when public health or the environment are endangered or there is a violation of law.

16

stringent standards than those established by the Act, the Kentucky General Assembly has restricted the Energy and Environment Cabinet from exercising that saved power. Specifically, the General Assembly has charged the Energy and Environment Cabinet with adopting clean air regulations that are "no more stringent than federal requirements." KRS 224.10-100(26). Even though the Act would allow Kentucky to enact more stringent standards under this savings clause, Kentucky statutes expressly prohibit the Cabinet from issuing more stringent regulations. *Id.* We find the fact that Kentucky has explicitly chosen not to allow its regulatory body to utilize more stringent regulations persuasive as to the Legislature's intent.

We hold that the requested injunction, which would require implementation of a particular type of pollution-control technology not required under Brown-Forman's and Heaven Hill's permits, conflicts with the Act by invading EPA and Metro District's "regulatory turf," *id.*, in a manner that the Kentucky General Assembly has spoken against. Therefore, an injunction to control an alleged nuisance when the state has already specifically balanced those factors is inappropriate. To conclude otherwise would produce the untenable situation identified in *American Electric Power* where courts act on limited records on an *ad-hoc* basis in an arena where they do not possess the necessary scientific, economic and technological expertise. We cannot have the circuit courts of this Commonwealth imposing pollution control technologies on distillers that might differ from circuit to circuit. The impact on the bourbon industry would be far too dire.

Therefore, we reverse the Court of Appeals insofar as it would allow this type of injunctive relief. While the trial court's reasoning was incorrect, the

17

result remains the same. The trial court properly dismissed the plea for injunctive relief as it indeed failed to state a claim upon which relief could be granted.

## IV. CONCLUSION

For the foregoing reasons, we affirm the Court of Appeals as to Miller's state-law damages claims; however, we reverse the Court of Appeals insofar as it held that Miller's claim for injunctive relief could go forward. Therefore, we remand this case to Jefferson Circuit Court for further proceedings consistent with this opinion.

All sitting. All concur.

COUNSEL FOR APPELLANT BROWN-FORMAN CORPORATION:

Charles J. Cronan, IV
Mark Richard Overstreet
Bethany A. Breetz
Marjorie Ann Farris

COUNSEL FOR APPELLANT HEAVEN HILL DISTILLERIES, INC.:

Virginia Hamilton Snell
Donald Joseph Kelly
Lisa Catherine DeJaco

COUNSEL FOR APPELLEE GEORGE MILLER:

None/Withdrawn

COUNSEL FOR AMICI CURIAE

David James Treacy